In re Rose LO BOSCO, Debtor.

KWINTER REALTY, Plaintiff,

v.

Rose LO BOSCO, Defendant.

Bankruptcy No. 880–04604.
Adv. No. 880–0863.

United States Bankruptcy Court,
E. D. New York,
at Westbury.

Oct. 20, 1981.

Raymond Claybrook, West Babylon, for debtor.

Stanley Polansky, North Babylon, for Kwinter Realty.

ROBERT JOHN HALL, Bankruptcy Judge.

Kwintner Realty (the "Plaintiff") has commenced an adversary proceeding seeking to have a brokerage commission owed to it by Rose Lo Bosco (the "Debtor") excepted from discharge. For the reasons set forth below, this Court determines that the debt in question is entitled to be discharged.

## I.

Sometime early in 1980, the Debtor concluded that her financial situation was such that she could no longer maintain her residence. Accordingly, she placed her home on the real estate market. Subsequently, a buyer was found and a contract was signed. The obligation in question, the validity of which is not in dispute, arises out of a real estate brokerage commission agreement dated April 30, 1980. This agreement provided that the Debtor would pay to the Plaintiff as a brokerage commission the sum of $2,939.30 "to be paid as, if and when, title actually closes and deed delivered, except for willful default of seller." The closing took place on July 2, 1980. The events surrounding the July 2 closing form the basis of the instant action.

The sale in question was a "cash-over deal," in which the buyer assumed the existing mortgage on the property and tendered cash over and above that amount to the seller. The agreed purchase price was $41,990.00 with the purchaser assuming the mortgage of $30,200.00, resulting in a cash transaction of almost $12,000.00. The Debtor testified that, as there were several outstanding judgment liens encumbering her land, she was aware that she would not receive the full $12,000.00. It was repeatedly asserted, however, by both the

Debtor and her attorney Raymond Claybrook, that the exact amount needed to clear the title was unknown to them until the closing was completed. They so testified notwithstanding the fact that prior to the closing the Debtor's attorney was in possession of a title report specifying all the judgments docketed against the Debtor's property.

At the closing, the Debtor's attorney, in order to pass good and marketable title to the purchaser, wrote out several checks against his special account, payable to the various creditors holding liens on the property and to the mortgagee-bank for mortgage arrears. When it was time to issue a check to the Plaintiff in accordance with the April 30 agreement, the Debtor's attorney found himself mysteriously out of checks. Although the Plaintiff's representative at the closing indicated that he preferred a check from Claybrook's special account, the Debtor and Claybrook convinced him to accept a check from the Debtor's personal checking account drawn on the Bank of Babylon. Upon assurances that the net amount from the sale of the house would be deposited in that account, the Plaintiff accepted the check. Furthermore, the check was postdated to July 3 in order to give the Debtor time to deposit the proceeds.

According to the Debtor's own testimony, which is not by any means consistent or clear, immediately following the closing, she returned to Claybrook's office and for the first time realized that she would receive only $5,700 from the sale. As she had many other outstanding debts, she claims it was then that she first considered filing for relief under the Bankruptcy Code.

Finally, by her own admission, on July 3, the Debtor took the $5,700, deposited $4,000 in her savings account at Manufacturer's Hanover Trust, kept $1,700 in cash and then proceeded to the Bank of Babylon where she stopped payment on the check issued to the Plaintiff. The $1,700 was subsequently used for household expenses, college tuition for her son, and a vacation for herself and her boyfriend.

The evidence produced by the Plaintiff established that the Debtor opened her checking account at the Bank of Babylon on July 1, the day immediately preceding the closing, with an opening deposit of $20. At no time did the Debtor's balance in this account exceed $161.

The Debtor filed a Chapter 7 petition on July 18, 1980. Schedule A–3 in her petition shows a debt to the Plaintiff of $2,940 for "Services Rendered, Date Incurred: 4/80." On September 25, 1980, the Plaintiff instituted this adversary proceeding seeking to have the above debt declared excepted from discharge.

## II.

In furtherance of the "fresh start" policy of the Bankruptcy Laws, *see* H.R. Rep.No.595, 95th Cong. 1st Sess. 118 (1977), *reprinted in* [1978] U.S.Code Cong. & Ad. News 5787, 5963, 6078, the courts have engrafted both substantive and procedural parameters onto the exceptions to discharge. First, they are to be strictly construed. *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *In re Danns*, 558 F.2d 114, 116 (2d Cir. 1977); *In re Paley*, 8 B.R. 466, 468 (Bkrtcy.E.D.N.Y.1981). Moreover, the burden of proving that a debt comes within one of the statutory exceptions is upon the party opposing the discharge. *In re Danns*, 558 F.2d at 116; *In re Paley*, 8 B.R. at 468; *In re Falk*, 3 B.R. 266, 271 (Bkrtcy.D.N.J.1980); *In re Jones*, 3 B.R. 410, 412 (Bkrtcy.W.D.Va.1980).

In the instant case, the Plaintiff has failed to indicate upon which section or sections it is relying. Presumably section 523(a)(2)(A) was intended,[1] which provides:

---

1. The complaint alleges:

6. That [the Debtor] had the funds in her hands with which to pay this [P]laintiff and refused and failed to place said funds on deposit in the bank whereat said check was collectible [sic].

7. That [the Debtor] obtained [P]laintiff's money upon a materially false statement given to [P]laintiff at the time when [the Debtor] knew or should have known she was about to file bankruptcy petitions.

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A) (Supp. III 1979). In addition to the limitations stated above, this subsection has been construed as requiring a finding of actual fraud consisting of: (1) a false representation by the debtor; (2) which he then knew to be false; (3) made with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations; (5) which proximately resulted in the creditor's loss. *In re Schlickmann*, 6 B.R. 281, 282 (Bkrtcy. D.Mass.1980) (citing *In re Houtman*, 568 F.2d 651, 655 (9th Cir. 1978)). *Cf. also In re Jones*, 3 B.R. at 412 (case law under § 17(a)(2) of the Act has been incorporated into § 523(a)(2) of the Code). Finally, the cases indicate that although the intent to defraud may be inferred from a totality of the circumstances, *In re Schlickmann*, 6 B.R. at 282, the standard of proof required is by clear and convincing evidence. *In re Netherland*, 8 B.R. 679, 680 (Bkrtcy.W.D. Va.1981); *In re Jones*, 3 B.R. at 412.

■ Initially, it should be noted that while the issuance of a check with knowledge that the account is lacking in funds to cover it may be seen as a false representation, *In re Kurant*, 3 B.C.D. 832, (M.D.Fla. 1977), that alone will not suffice to prove an intent to defraud. "An NSF check is not, however, conclusive evidence of an intent to defraud, but must be considered in light of all the facts and circumstances." *In re Wise*, 6 B.R. 867, 870 (Bkrtcy.M.D.Fla.1980); *accord, In re Eason*, 1 B.R. 604, 607 (Bkrtcy. E.D.Va.1979); *In re Kurant*, 3 B.C.D. at 832.

In the instant case, however, it is not necessary for the Court to determine whether the Debtor's conduct in this regard rises to the requisite level of malfeasance. Assuming, arguendo, that this Court were to find a clear intent on the Debtor's part to "defraud" the Plaintiff by means of the bad check, that still leaves unresolved the question of reliance. *In re Anderson*, 10 B.R. 296, 297 (Bkrtcy.W.D.Wis.1981); *In re Anson*, 9 B.R. 741, 744–45 (Bkrtcy.W.D.Mo. 1981); *In re Wise*, 6 B.R. at 869. In other words, what money, property, services or extension, renewal or refinancing of credit did the Debtor obtain from the Plaintiff by virtue of the Plaintiff's reliance on the bad check? *See* 11 U.S.C. at § 523(a)(2)(A).

The $2,939.30, representing the commission, was not obtained from the Plaintiff; it was obtained from the purchaser of the Debtor's property. In addition, contrary to the Plaintiff's allegations, *see* note 1 *supra*, it was not the Plaintiff's money, but rather was the Debtor's money subject to the contractual debt.[2] Furthermore, in that the brokerage service, to wit, the finding of a buyer, was obviously completed prior to the closing, it could not have been performed in reliance upon the bad check.[3] Finally, although it is conceivable that the Plaintiff relinquished some rights at the closing in exchange for the bad check, it has given this Court no indication as to what those rights may have been. Consequently, it appears that the Plaintiff was put in no

---

**2.** This fact also defeats a claim under section 523(a)(4). *See In re Paley*, 8 B.R. 466; *In re Falk*, 3 B.R. 266; 3 *Collier on Bankruptcy*, ¶ 523.14(1c), (3) (15th ed. 1981).

**3.** Throughout the trial, the Plaintiff also attempted, without success, to obtain the Debtor's concession that, from the first, she never intended to pay the commission thereby establishing the contract as fraudulent. Repeated reference was made to the offered purchase price and outstanding liens with the apparent purpose of undermining the Debtor's contention that she did not know what her net on the sale was to be until after the closing. Although the Court is convinced that the Debtor attended the closing without any intention of paying the Plaintiff, the Plaintiff has failed to offer any clear proof that this intention dated back to the creation of the contract. In this regard, the Court finds the Debtor more dimwitted than Machiavellian. Consequently, the Plaintiff has failed to meet its burden of proof.

worse a position by accepting the check than it would have been had the Debtor repudiated the brokerage contract at the closing.

Therefore, the burden being on the Plaintiff to establish a *prima facie* case, and the Plaintiff having failed to do so, the complaint is dismissed and the debt declared dischargeable.

So Ordered.