**In re John Edwin PAULK, Debtor.**

**A.G. EDWARDS & SONS, INC., Plaintiff,**

**v.**

**John Edwin PAULK, Defendant.**

**Bankruptcy No. 82–20012–AMER. Adv. No. 82–2017–AMER.**

United States Bankruptcy Court, M.D. Georgia, Americus Division.

Dec. 22, 1982.

See also 25 B.R. 919.

Larry K. Butler, Albany, Ga., for plaintiff.

Howard S. McKelvey, Americus, Ga., for defendant.

## COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

ALGIE M. MOSELEY, Jr., Bankruptcy Judge.

Plaintiff seeks nondischargeability of its debt under 11 U.S.C. § 523(a)(2)(A), false pretenses or false representations; and under 11 U.S.C. § 523(a)(2)(B), a false statement in writing—a check. Herein, it is found that Plaintiff's debt is dischargeable.

### FINDINGS OF FACT

Debtor filed his Chapter 7 case on February 1, 1982 and scheduled a debt of $10,-601.50 to Plaintiff, hereinafter (Edwards), which debt was scheduled as disputed and unsecured. The debt to Edwards arose generally out of a course of commodity future trading engaged in between Debtor and Edwards in a margin account.

Debtor is a postal clerk living at Fitzgerald, Georgia and had traded in commodity future contracts of various types beginning sometime in 1979. Insofar as the Edwards account was concerned, Debtor always traded with the Edwards' office at Albany, Georgia. He had traded commodity futures contracts in an Edwards' account since 1980. In the year 1980, the Debtor had a net loss in the Edwards' account of $17,-310.40; in 1981, a net loss in excess of $20,000; and in 1982, a net loss of $20,954. All losses were paid by the Debtor except the $10,601.50 scheduled by the Debtor in this case. Debtor's registered representative at Edwards for all relevant times was John T. Gaskins. Until January of 1982, Debtor generally traded only one or two contracts at a time. Through the calendar year 1981, Debtor's relationship with Ed-

wards and Edwards' relationship with Debtor was excellent. On January 5 or 6, 1982, Mr. Gaskins communicated a margin call to Debtor asking Debtor to pay $3,000 to clear up a deficit of $360.50 at the end of the day on January 5, 1982.

On January 6, 1982, Debtor wrote a $3,000 check (Exhibit P–9) to Edwards and also on January 6, 1982 delivered the check to Edwards. The check was deposited by Edwards, according to notations on the check, in Edwards' account at the First State Bank and Trust Company in Albany, Georgia on January 6, 1982. The drawee bank was National Bank of Fitzgerald, Georgia. At the time the check was delivered, Debtor knew that there was not enough funds in the account to pay the check. Debtor, however, had an informal arrangement with the National Bank of Fitzgerald whereby bank had made a practice on numerous occasions to honor Debtor's overdrafts. Debtor expected the bank to pay the check. At the time of the delivery of the check, no agreement existed between Debtor and bank that bound the bank to pay the check other than the past dealings between bank and Debtor. There appears on the check "JAN 82 06 [January 6, 1982] Pay Any Bank PEG Bank of the South, N.A. 64–7 Atlanta, Georgia 64–7." The imprint of the Federal Reserve Bank of Atlanta appears on the check dated January 7, 1982. There appears on the check a stamp from the Federal Reserve Bank in Atlanta, Georgia in red ink the date, January 11, 1982. On the front of the check there is a red stamp showing NSF, but no date appears. Attached to the check is a memorandum from the First State Bank and Trust Company of Albany, Georgia returning the check to A.G. Edwards and Sons indicating that it was returned for nonsufficient funds. This memorandum is dated January 15, 1982.

Defendant's Exhibit D–4 and Defendant's Exhibit D–5 were admitted into the evidence, and these show previous overdrafts having been paid by bank. These are on bank forms showing at the top "YOUR CHECK HAS BEEN PAID." D–6 is also offered by Defendant to show that the bank paid the $3,000 check dated January 6, 1982. Although similar in appearance to D–4 and D–5, this D–6 at the top shows "YOUR CHECK HAS BEEN RETURNED." This difference was not mentioned in the testimony. January 7, 1982 is shown as the date presented to National Bank of Fitzgerald for payment. However, clearly stamped thereon, as on D–4 and D–5, is a red ink stamp showing that the $3,000 check has been paid by the National Bank of Fitzgerald. The paid stamp is dated also January 7, 1982. This D–6, showing that the check had been paid, was received by the Debtor in the mail on January 8, 1982. The Debtor, accordingly, understood on January 8 that this $3,000 check had been paid by the bank in accord with their informal arrangement and as was done on D–4 and D–5. The Debtor testified that on January 12, 1982 that the National Bank of Fitzgerald notified him that the $3,000 check had not been paid, and Debtor immediately went to a Mr. Crawley at the bank with whom he had always dealt and talked to Mr. Crawley about the check. Debtor learned from Mr. Crawley that he, Mr. Crawley, still had possession of the $3,000 check.

On the strength of Debtor's check, Edwards permitted Debtor to make trades in his account on Thursday, January 7, 1982; Friday, January 8, 1982; and Monday, January 11, 1982. At the end of business on January 11, 1982, Debtor's account with Edwards showed a net balance in the account of $1,483.

On the morning of January 12, 1982, Debtor spoke with Mr. Gaskins at Edwards, and Debtor placed certain orders which Edwards filled. At the end of the day Debtor had lost some $2,000 which erased any equity in Debtor's account created by the deposit of the $3,000 check. The net deficit was $1,011. On the evening of January 12, 1982, Debtor was called by Mr. Gaskins from Mr. Gaskins' home. Mr. Gaskins had been out of the office most of the afternoon on January 12. Mr. Gaskins advised the Debtor of his losses on that day. Mr. Gaskins, not having access to the Debtor's rec-

916

ords, did not know that the losses had created a net deficit in the account. There is sharp conflict in the testimony concerning what was said in this conversation in the evening of January 12, 1982. Debtor testified that he mentioned to Mr. Gaskins that the $3,000 check might be dishonored and if it was that Gaskins should "run it through again." Debtor testified that he and Mr. Gaskins talked about the commodity market, but that Debtor made no orders. Mr. Gaskins testified that the Debtor never mentioned any possibility that the $3,000 check would be bad, and Gaskins testified that the Debtor told Gaskins to "continue what we have been doing." Debtor testified that he gave no authority in this conversation of January 12 to Gaskins to trade on the 13th as he, Debtor, knew he had a deficiency in the account. Although Edwards had submitted to Debtor in November, 1981 an "Agreement for discretionary authority in connection with commodities future trading accounts" to be signed by Debtor, Debtor never executed this agreement and Gaskins had no written discretionary authority to trade for Debtor on Debtor's account (see Exhibit D–7). Although Debtor denies it, Gaskins testified that Debtor told him (Gaskins) to "continue what we have been doing" and he, Gaskins, understood this to mean continue what had been done during the day of January 11 when Debtor was at Gaskins' office all day making various commodity trades.

On the morning of January 13, 1982, there was a deficit in Debtor's account at Edwards. Under normal circumstances Gaskins would have been aware of this from Edwards' computer, and there being a deficit, would not have traded on Debtor's account. However, on the morning of January 13, 1982, Edwards' computer was broken down. Because Gaskins did not know of the deficit, he placed orders according to his understanding of the conversation with Debtor the night before. The market turned sharply against Debtor's position. Debtor's positions lost $6,431.50 as the market moved against Debtor. Gaskins attempted to reach Debtor without success. Edwards' computer then began to function

and Gaskins learned of the outstanding deficit in the account.

Later in the evening of January 13, 1982, Mr. Gaskins was able to reach the Debtor and told the Debtor of the results of the days trading. Gaskins testified that it was on the evening of the 13th that Debtor told him that the check might not be good. Gaskins testified that in this conversation on the evening of the 13th no mention was made about trades being unauthorized trades and that indeed Debtor made orders for the next trading day. Debtor, however, testified that he told Mr. Gaskins in this conversation on the evening of January 13 that the trades of January 13 had been unauthorized. Later that evening Debtor telephoned Mr. Gaskins' superior, a Mr. Welchel, and told him that the trades had been unauthorized and directed him to liquidate all outstanding positions and to close the account. This was done on January 14, 1982. When the account was closed, there was a deficit of $10,656.25. Subsequently, on or about Friday, January 15, First State Bank and Trust Company of Albany, Georgia notified Edwards that the $3,000 check dated January 6, 1982 was dishonored. This brought the account to a net deficit of $10,624.25. Since there was a net deficit of $360.50 in the Edwards' account when the dishonored check was received, deficits of $10,295.75 resulted following the receipt of the check by Edwards.

No testimony of Mr. Crawley at the National Bank of Fitzgerald was offered.

As to the margin account, the evidence in this case fails to show clearly what the rules were as to the required amount before trading was permitted, and if there were any such rules, the evidence shows that the rules were not strictly enforced by Edwards.

## CONCLUSIONS OF LAW

From the foregoing, the Court is to determine whether Edwards' debt is nondischargeable under 11 U.S.C. § 523(a)(2)(A) and nondischargeable under 11 U.S.C. § 523(a)(2)(B). The burden of proof has

not been carried by the Plaintiff, and this is particularly so because the burden of proof here is in the nature of fraud and such burden is by clear and convincing evidence.

■ Traditionally, the debtor's "fresh start" is one of the primary purposes of the bankruptcy law, and consequently, exceptions to discharge must be strictly construed. *Matter of Vickers,* 577 F.2d 683, 687 (10th Cir.1978) *citing to Gleason v. Thaw,* 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915) and other cases; *In re Huff,* 1 C.B.C.2d 171, 173 (B.Ct.Utah 1979). Consequently, courts have required a higher standard of proof, that is, "clear and convincing evidence." *See In re Huff, supra; Brown v. Buchanan,* 419 F.Supp. 199 (E.D.Va.1975) (citing cases). The same standard of proof has been applied generally under the Code. *See, e.g., In re Neuman,* 13 B.R. 128 (Bkrtcy.E.D.Wis.1981) (proof by "clear and convincing evidence" required); *In re Stone,* 11 B.R. 209 (Bkrtcy.S.C.1981) (proof by "clear, cogent and convincing" evidence required). This standard has been specifically applied in cases dealing with N.S.F. checks. *See In re Lo Bosco,* 14 B.R. 739, 742 (Bkrtcy.E.D.N.Y.1981) (proof by "clear and convincing" evidence required). If the evidence is in equilibrium, then the debt must be discharged. See the well-reasoned opinion of Chief District Judge Alexander A. Lawrence in *In re Conner,* 2 BCD 288 (D.C.S.D.Ga.1976) and see also *In re Nichols,* 17 B.R. 470, 471 (Bkrtcy.M.D.Fla.1981).

Accordingly, the Court finds as matter of fact and of law, that the Plaintiff has failed to carry its burden of proof by failing to prove its allegations by clear and convincing evidence. Should the Court be in error in finding that the Plaintiff has failed to carry its burden of proof, it is still clear that the debt is dischargeable.

The pertinent portions of 11 U.S.C. § 523(a)(2) are as follows:

(a) A discharge ... does not discharge an individual debtor from any debt—

(1) ...

(2) for obtaining money, property, services, or an extention, renewal or refinance of credit by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; or

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive;

■ First to be considered is 11 U.S.C. § 523(a)(2)(B). Edwards contends that the check was a "statement in writing" which contained materially false information about the Debtor's financial condition. This "information" was that the Debtor had money in his bank account, and it would have been false since at the time the check was issued Debtor did not have enough money to cover it.

However, for a debt to be nondischargeable as made in reliance on a "false financial statement," first there must be a "statement." A check is literally a "negotiable instrument." Official Code of Ga.Ann. § 11–3–104 (Michie 1982). Hence, a check is not a statement at all; it is an evidence of debt.

This is the principle on which the recent U.S. Supreme Court case of *Williams v. United States,* —— U.S. ——, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982) turned. In *Williams* a criminal defendant engaged in a "check kiting" scheme involving issuance of N.S.F. checks on bank accounts insured by F.D.I.C. and made payable to banks insured by the F.D.I.C. Defendant was charged under 18 U.S.C. § 1014 which made it a crime for one to "knowingly mak[e] any false statement ..." to influence a loan decision by an F.D.I.C. insured bank. The Supreme Court held that the defendant could not have been guilty of such a crime. The Court said:

Although petitioner [defendant] deposited several checks that were not supported by sufficient funds, that course of conduct did not involve the making of a "false statement," for a simple reason: technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as "true" or "false." Petitioner's bank checks served only to direct the drawee banks to pay the face amounts to the bearer, while committing petitioner to make good the obligations if the banks dishonored the drafts. Each check did not, in terms, make any representation as to the state of petitioner's bank balance. As defined in the Uniform Commercial Code, a check is simply "a draft drawn on a bank and payable on demand," § 3–104(2)(b), which "contain[s] an unconditional promise or order to pay a sum certain in money," § 3–104(1)(b). As such, "[t]he drawer engages that upon dishonor of the draft and any necessary notice of dishonor or protest he will pay the amount of the draft to the holder." § 3–413(2). The Code also makes clear, however, that "[a] check or other draft does not of itself operate as an assignment of any funds in the hands of the drawee available for its payment, and the drawee is not liable on the instrument until he accepts it." § 3–409(1). *Id.*, 3092.

This is also the principle upon which *Obrist v. Christensen,* 337 F.2d 220 (9th Cir.1964) turned. In *Obrist* debtor's discharge, in general, was challenged under a provision of the Act which formerly made issuance of a false financial statement grounds for a general denial of discharge. The debtor had written a number of N.S.F. checks to the creditor in exchange for cattle. The checks were, in due course, dishonored. The Court held the debt dischargeable and said:

> While obviously a financial statement need not be preceded by a recital of, "This is a financial statement," yet it ought to have some relation to the popular concept of what a financial statement is. We go so far as to say that this would not normally include a negotiable instrument. *Id.*, 220.

Therefore, it is clear that a check, being a "negotiable instrument," a form of contract, creating rights, and not a statement, supplying information, cannot be a "false financial statement" within the meaning of 11 U.S.C. § 523(a)(2)(B). *In re Murray,* 7 B.R. 899, 900 (Bkrtcy.W.D.Mo.1981); *see In re Montbleau,* 13 B.R. 47, 49 (Bkrtcy.Mass. 1981).

■ Next to be considered is 11 U.S.C. § 523(a)(2)(A). The issuance of a N.S.F. check, standing alone, is not conclusive of conduct which will justify a finding of nondischargeability. *E.g., In re Lo Bosco, supra.* For the issuance of a check to be, or be part of, a "false pretense" or "false representation" sufficient to render a debt nondischargeable, several elements must be proved: (1) a false representation or representations by debtor; (2) debtor's knowledge of the falsity of the representation; (3) debtor's intention and purpose to deceive the creditor; (4) creditor's reliance on such representations; (5) creditor's losses, proximately caused by debtor's false representations. *E.g., In re Lo Bosco,* supra., 742; 3 *Collier on Bankruptcy,* ¶ 523.08[4] (15th Ed. 1979).

■ Assuming without deciding that element one is present, the Debtor had no knowledge of the falsity of the representation as he was relying on the informal arrangements that he had previously with the bank and also the slip he received from the bank showing that the check had been paid. For the same reasons, Debtor's intention and purpose to deceive Edwards is not shown. Because Edwards failed to strictly adhere to its rule of margin requirement, it cannot be said that Edwards relied on any misrepresentations of Debtor. Also, the evidence does not show that Edwards' losses were proximately caused by Debtor's false representations. The major losses were caused by the fact that Edwards' computer was broken down on the morning of January 13, 1982, and had the computer been working, it would have shown a deficit in the account and because of the margin re-

quirements, according to Gaskins' testimony, no trading could have taken place on the 13th.

As shown above, all of these elements must be proved by clear and convincing evidence, and such clear and convincing evidence is lacking in this case.

The foundation of Plaintiff's case is the $3,000 nonsufficient funds check. As shown above, this is not a "statement," and, accordingly, it cannot be "false." Without the check, there is little or no evidence of false pretenses or false representations that would require the finding of a nondischargeable debt under 11 U.S.C. § 523(a)(2)(A).

An Order is entered simultaneously herewith denying Edwards' complaint and determining that the debt is dischargeable.