**In re Amanda Noreen YODER, Debtor.**

**Percy DODD and Leavondia Dodd, Plaintiffs,**

v.

**Amanda Noreen YODER, Defendant.**

**Bankruptcy No. NG 82–04085. Adv. No. 83–0255.**

United States Bankruptcy Court, W.D. Michigan.

Oct. 7, 1983.

Dunnings & Canady, P.C., Clinton Canady, III, Lansing, Mich., for plaintiffs.

Paul Martin, Lansing, Mich., for defendant.

## OPINION AND ORDER

DAVID E. NIMS, Jr., Bankruptcy Judge.

### DISCHARGEABILITY—FRAUD—COLLATERAL ESTOPPEL

Percy Dodd and Leavondia Dodd filed their complaint in this proceedings for a determination that the judgment awarded in their favor against Amanda Noreen Yoder, the debtor and defendant in the sum of $2,410.06 by the Circuit Court for the County of Clinton, Michigan, was nondischargeable. By agreement the parties submitted the case on the transcript of that proceeding.

Yoder was the owner of a 103 acre farm subject to a bank mortgage. At the time of the negotiations for the sale of the farm to Dodds, the premises were subject to an oral lease to Victor Jorea who had planted 48 to 52 acres in wheat and 3½ to 4 acres in alfalfa. The lease included the use of a shed. The rental was $800.00 (I assume this was for the year). The rental was never paid for the year of the sale. Yoder had the property listed for sale at the time of the lease and understood that Jorea would sell his crop to Yoder or to the new owner if a sale occurred during the term of the lease. The sale would include the cost of seed, fertilizer and his time. Jorea testified at the State Court trial that he told Yoder that when she got ready to sell the farm, "I won't be hard to get along with." When she asked if he would sell the crop, he said, "Sure, any way you want to make a deal."

Around January or February of 1981, Dodds through their real estate broker, Jim Newland, expressed an interest in purchasing the farm. There was no secret about the lease and Dodds were aware of it from the beginning through Newland, who was handling all of the negotiations. Newland informed Dodds that there were 30 acres not in wheat but there is no indication as to the source of this information. Because they raised pigs, Dodds required corn and would have to grow it or purchase on the open market. In the spring, after the snow melted, it was revealed that there was no available acreage. Percy Dodd told Newland before the papers were signed that they should try to work out some type of a deal.

The testimony in the State Court trial indicated that some negotiations had taken place between Yoder and Jorea. There had been an offer made on the farm in December and that farmer had suggested $3,200.00 as a fair amount for buying out Jorea's lease. This figure was mentioned to Jorea and he indicated that it sounded pretty fair and he would get back to Yoder. He never got back to Yoder.

Without any final agreement on the lease having been made verbally or in writing, the sale was closed March 3, 1981, with Dodds paying $94,500.00 for the farm. At that time Yoder stated that everything was taken care of or was to be taken care of.

Dodds moved onto the farm on March 7, 1981. Sometime later Mr. Dodd spoke with Jorea who told him that Yoder had sent him a $3,200.00 check but that this was $1,000.00 short. Dodd asked if they paid the extra $1,000.00 would everything be all right but again Jorea never gave an answer. Jorea testified that he said he would be agreeable to sell out for $1,000.00 more but no one paid him the $1,000.00. Two months later Jorea paid Dodds the $3,200.00 which they accepted as a partial settlement. Percy Dodd testified that he had agreed to contribute one half of the money to buy out the land lease through Newland on "the first, the 7th of 1981." Apparently this was a part of an addendum received in evidence but was not made available to this court. Jorea proceeded to harvest and sell the crops except for the straw. He did give up the use of the shed.

In the complaint filed by Dodds, the sole allegation bearing on dischargeability is paragraph 2 which states.

"That this debt is nondischargeable pursuant to 11 U.S.C.S.(a)(2) for the reason that it arose out of a fraud action in which the Circuit Court for the County of Clinton issued a Judgment finding that Yoder committed fraud by false representation to which she represented that certain portions of a real estate had been resolved when in fact they were not and that was well known to her."

I cannot find that this debt is nondischargeable because of the findings by the State Court. In the first place, that Court did not find that Yoder committed fraud by false representation. The opinion of the Judge from the bench mentions nothing of fraud or misrepresentation. Instead the Judge closed his opinion by saying:

"I don't see any bad faith, and therefore, no basis, as I understand it, for the award of attorney fees."

But, even if the Judge had made findings of fraud, misrepresentation or false pretenses, I would not be bound by such a finding. *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979).

11 U.S.C. Section 523(a)(2) provides in part that a discharge does not discharge an individual debtor from any debt

"for obtaining money, property * * by
(a) false pretenses, a false representation, or actual fraud * * "

In *In re Valley*, 21 B.R. 674 (Bkrtcy.D. Mass.1982), the court lists the elements that must be proved in order to deny dischargeability under 11 U.S.C. § 523(a)(2)(A) at p. 679:

"Looking first at § 523(a)(2)(A), the courts have generally applied a five part test for determining the dischargeability of a debt incurred by fraud or false rep-resentations. See *In re Houtman*, 568 F.2d 651 (9th Cir.1978) (decided under § 17(a)(2) of the old Act); *In re Brewood*, 15 B.R. 211, 8 B.C.D. 483 (Bkrtcy.D.Kan. 1981). The requirements are: (1) a false representation by the debtor; (2) known to be false at the time it was made; (3)

made with the intention and purpose of deceiving the creditor; (4) which was reasonably relied upon by the creditor; (5) which resulted in loss or damage to the creditor as a result of the false representation. *In re Houtman*, supra at 655; *In re Kojoyian*, 7 B.R. 719 (Bkrtcy.D.Mass. 1980)."

See also, *In re Lamb*, 28 B.R. 462 (Bkrtcy. W.D.La.1983); *In re Kalinowski*, 27 B.R. 114 (Bkrtcy.M.D.Fla.1983); *In re Donald*, 26 B.R. 521 (Bkrtcy.W.D.Ky.1983); *In re De-Rosa*, 20 B.R. 307 (Bkrtcy.S.D.N.Y.1982); *In re Toleikis*, 19 B.R. 944 (Bkrtcy.E.D.Mich. 1982); *In re Roberto's Inc.*, 18 B.R. 551 (Bkrtcy.S.D.Fla.1982); *In re Lo Bosco*, 14 B.R. 739 (Bkrtcy.E.D.N.Y.1981); *In re Trewyn*, 12 B.R. 543 (Bkrtcy.W.D.Wis.1981).

The Bankruptcy Reform Act of 1978 added to Section 523(a)(2) the words "actual fraud" which was not in Section 17(a)(2) of the Bankruptcy Act of 1898. *In re Donald*, supra, defines these words as follows:

"Actual fraud 'consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." 3 Collier on Bankruptcy, ¶ 523.08[5] (15th Ed.1979). See also *In Re Fox*, 13 B.R. 827, 829 (Bkrtcy. W.D.Ky.1981)."

See also *In re Lamb*, supra; *In re Netherland*, 8 B.R. 679 (Bkrtcy.W.D.Va.1981).

Dodds have the burden of proof and must prove each element by clear and convincing evidence. As stated in *In re Netherland*, supra, at p. 680:

"The burden of proof in this case as in other cases rests upon the Plaintiff to prove the essential allegations required to have its debt adjudged nondischargeable since the standard required in these cases is that evidence sufficient to prove fraud, which is never presumed, such evidence must be clear, cogent and convincing. Fraud can never be found on evidence that is vague, conjectural and unconvincing."

See also *In re Lamb, supra; In re Brink,* 27 B.R. 377 (Bkrtcy.W.D.Wis.1983); *In re Kalinowski, supra; In re Posick,* 26 B.R. 499 (Bkrtcy.S.D.Fla.1983); *In re Paulk,* 25 B.R. 913 (Bkrtcy.M.D.Ga.1982); *In re Carothers,* 22 B.R. 114 (Bkrtcy.D.Minn.1982); *In re Valley, supra; In re DeRosa, supra; In re Roberto's Inc., supra; In re Rauch,* 18 B.R. 97 (Bkrtcy.W.D.Mo.1982); *In re Lo Bosco, supra.*

Also, exceptions to discharge of a debt should be literally and strictly construed against the creditor and liberally construed in favor of the debtor. *Neal v. Clarke,* 95 U.S. 704, 24 L.Ed. 704 (1878); *Gleason v. Thaw,* 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915); *In re Posick,* 26 B.R. 499 (Bkrtcy.S.D.Fla.1983); *In re Paulk,* 25 B.R. 919 (Bkrtcy.M.D.Ga.1982); *In re Paulk,* 25 B.R. 913 (Bkrtcy.M.D.Ga.1983); *In re Carothers,* 22 B.R. 114 (Bkrtcy.D.Minn.1982); *In re DeRosa, supra.* In deciding this case, the court must only consider the situation as it existed when the property was sold. What took place thereafter can only be relevant to the extent that it shows the state of mind of the debtor at the time she was paid the purchase price. As was stated by *In re Cokkinias,* 28 B.R. 304 (Bkrtcy.D. Mass.1983):

> "The Court is not now passing on whether *subsequent* to the loan transaction the debtor may have made a false statement which caused § 523(a)(2)(A) to be operable. Such a determination is irrelevant. The law is clear on this point. '[I]f the property was obtained prior to the making of any false representation, subsequent misrepresentation will have no effect upon the discharge of the debt ... The plaintiff must prove that the claimed fraud existed at the *inception* of the debt and that [he] relied upon it.' (citation omitted) (emphasis supplied). *In re Gennaro,* 12 B.R. 4 (Bkrtcy.W.D.Pa. 1981). See also *In re Vissers, supra* [21 B.R. 638] at 640 ('[t]he fraud necessary to make a debt nondischargeable must exist at the inception of the debt'), *In re DeRosa, supra* [20 B.R. 307] at 312 ('the requisite fraudulent intent must be shown to have existed at the time the debtor

obtained the money, property, services or extension, renewal or refinance of credit'); *In re Jenes,* 18 B.R. 405, 407–408 (Bkrtcy.S.D.Fla.1981) ('[i]f property is obtained prior to the making of any false representation, subsequent representations will not prevent discharge of the debt.'); *In re Geyen,* 11 B.R. 70, 72 (Bkrtcy.W.D.La.1981); ('subsequent misrepresentations will have no effect upon the discharge of the debt'); and *In re Shepherd,* 13 B.R. 367, 372 (Bkrtcy.S.D. Ohio 1981) ('§ 523(a)(2)(A) requires that the false representation be the reason for the creditor's extension of credit.')."

*In re Trewyn,* 12 B.R. 543 (Bkrtcy.W.D. Wis.1981), is somewhat similar to the case before this court. There the debtor entered into a contract to replace the creditor's roof for $7,200.00. $5,200.00 was paid in advance. The court in granting a discharge of the debt, concluded at p. 546:

> "Long's case is based on false statements made by Trewyn while negotiating the roofing contract. Trewyn allegedly misrepresented the size of his crew, his insurance coverage and his financial position. At the time of contracting in February, Trewyn received an initial payment of $5,200 from Long. Both parties understood that payment to bind the contract and finance the purchase of materials. Thereafter, Trewyn purchased materials and commenced work by removing a portion of Long's roof. Although there were delays, the greater weight of the evidence indicates that Trewyn intended, at least at the time he received the only payment made by Long, to undertake the work for which the payment was made. There was no convincing evidence that Trewyn intended to deceive Long regarding his willingness and ability to perform the contract. Trewyn's intent at the time he received the $5,200 down payment is crucial. Absent clear and convincing evidence that Trewyn did not intend to complete Long's roofing job as contracted, Long cannot prevail on his claim of non-dischargeability."

Yoder was not a shrewd business woman. She entered into a lease with Jorea with no written agreement. She accepted his word that if she sold the property, he would do the right thing. She allowed him to procrastinate when she was trying to get him to settle their differences. When he told Percy Dodd that the $3,200.00 was $1,000.00 short and Dodd immediately offered him $1,000.00, he never answered and refused to negotiate. Yoder didn't even receive the rent agreed upon after all the difficulties caused her by Jorea. Yoder thought that she had things taken care of when the sale was closed. She relied on Jorea's earlier statement that $3,200.00 seemed fair and that he would get back to her on it. She relied on Jorea being a man of his word. Her confidence was misplaced. Perhaps she was not wise but I cannot find by clear and convincing evidence that she knew her statement was false and that she made it with the intention of deceiving Dodds.

I also do not find that Dodds reasonably relied on the statement. The testimony shows that only the Dodds were represented by a professional person. They were at all times aware of the lease but failed to inquire as to how the lease had been taken care of or insist on the presenting of a written agreement signed by Jorea.

I cannot find by clear and convincing evidence that Yoder was guilty of any "deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat" the Dodds and that her statement that the lease was being taken care of was said "with the design of perpetrating what is known to be a cheat or deception."

Because counsel chose to submit this proceeding on the transcript of the trial before the State Court, I did not have the advantage of seeing and hearing the witnesses. However, the State Judge did hear the witnesses and he could find no bad faith on the part of Yoder.

The complaint is dismissed with prejudice.