Samir C. **LAHIRI** Debtor.

**MEGA ENTERPRISES, INC.,** and
**Seymour Weiss Plaintiffs,**

v.

Samir C. **LAHIRI** Defendant.

**Bankruptcy No. 96–11902 DWS.**
**Adversary No. 97–0199.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Oct. 14, 1998.

Edward Cohen, Philadelphia, PA, for Debtor.

Robert Katz, Havertown, PA, for Plaintiffs.

Barry A. Solodky, Lancaster, PA, trustee.

## MEMORANDUM OPINION [1]

JUDITH K. FITZGERALD, Bankruptcy Judge.

Before the court is the complaint of Mega Enterprises and Seymour Weiss to determine whether a debt is nondischargeable under 11 U.S.C. § 523(a)(2)(A), § 523(a)(2)(B), or § 523(a)(6). The complaint originally included a count under § 523(a)(4), but that

---

1. This Memorandum Opinions constitutes the court's findings of fact and conclusions of law. The court's jurisdiction was not in issue. This is a no asset case and the trustee has filed a Report of No Distribution.

count was withdrawn at the conclusion of trial.

The facts as established at trial are not complex. Mr. Weiss was a friend of Mr. Lahiri's (Debtor). Through Mega Enterprises, Weiss owned and operated a steel brokerage business. He purchased steel on his own account and resold it to another broker or to an end user like Debtor. Debtor operated a corporation known as LEI Products Corporation (hereafter "LEI"), a company that produced steel slats and overhead doors. The business relationship of the parties ran from February, 1991, until June, 1992. Weiss would receive an order from Debtor on behalf of LEI, either for galvanized steel coils or for ungalvanized steel sheets. Weiss would find a supplier and purchase the required product on his own account. Debtor would specify whether the shipment was to be made to a location where it would undergo additional preparation before it was utilized for manufacturing or whether Debtor would pick it up. In the first instance, Weiss would direct his supplier to deliver it. If Debtor was to pick up the steel, Weiss would notify Debtor when the steel was available. Weiss had credit terms from his suppliers and typically had to pay invoices within 30 or 45 days. In turn, he extended credit and required payment in full within 30 days. Weiss also offered a discount for payments made within ten days. During the course of their dealings, LEI ordered about a million tons of steel from Weiss, for a total price of $193,655.24.[2] Unfortunately, LEI issued payments, via checks on its bank account generally signed by Debtor, for only $135,000 of that amount, and of the $135,000 sent to Weiss, 15 checks were returned on account of insufficient funds. Weiss received payments of $108,188.40 and, as of the date the bankruptcy was filed, was owed $85,466.84 against his invoices. Weiss's out of pocket cost for the $193,000 of invoiced product was approximately $150,000.

After several months of transactions, payments were in arrears and 60 days or more delinquent. However, Weiss charged interest on the late payments, which was paid, and so Weiss continued to do business.

Nonetheless, the situation got worse, at which point Weiss decided that the arrears were too great and Weiss could not tolerate the risk of nonpayment. As a result, Weiss stopped ordering steel for LEI. By August of 1991, LEI, which had continued to make payments even though it could not order new product from Weiss, had paid the debt down to about $7,000. In October, 1991, Debtor approached Weiss with a request to purchase more steel, and Weiss again transacted business with Debtor on behalf of LEI. The pattern of making partial payments continued. Debtor would issue a check on LEI's account that would clear, then another that would not. The 15 "NSF" checks were interspersed with many checks for which funds were available. At first, Debtor replaced the "NSF" checks but later failed to do so or, on one occasion, issued a replacement check that also was returned for insufficient funds.

Because checks that cleared were mixed with those that did not, Weiss adopted a practice of holding the steel until he received a check. Upon receipt of payment, Weiss would notify Debtor that steel was available and release it. Even this was not enough to insure that checks did not bounce, however. Debtor always promised to clear the deficiency but he did not do so. By June of 1992, Weiss stopped all business dealings with Debtor and LEI.

LEI's nonpayment created a financial drain on Weiss, who had to borrow money from his bank and from his children in order to pay his own steel suppliers. The bank required his wife to sign the line of credit and took a mortgage on the marital home as security for repayment. Weiss used $80,000 of his available line to repay his suppliers. His reputation in the business was in jeopardy because he was unable to pay for the steel he ordered for LEI. His suppliers refused to sell to him until he paid them.

Debtor conceded that the "NSF" checks totaled $24,751.46. He contends that he repaid $4,470 of that amount pursuant to an order of restitution entered against him in a state court criminal proceeding and Plaintiffs agree that Debtor completed payments due

---

**2.** At trial, the parties testified to round numbers. The complaint contains the exact figures at issue.

under an order entered in that proceeding.[3] Thus, Weiss is still owed $80,996.84. However, Mega Enterprises and Weiss seek a declaration that damages of $175,174.86 are nondischargeable, on the theory that Mega Enterprises has a non-preferential judgment against Debtor for that amount, issued on or about November 23, 1994, in the Court of Common Pleas for Montgomery County, Pennsylvania.

On the record in this challenge to dischargeability, Mega Enterprises failed to prove that it was owed $175,174.86. However, it clearly established that it is owed in excess of $80,000 for unpaid steel products and Weiss established that, to repay his suppliers, he and his wife borrowed funds from relatives and from a lender who took a mortgage on their home as security. Weiss must repay the secured lender. The evidence supports the conclusion that Mega Enterprises and Weiss were damaged by $80,996.84.

Debtor offered several lines of defense, none of which the court finds credible. His first was that of the one million pounds of steel he purchased from Weiss, 243,000 pounds were nonconforming and, therefore, were rejected. Debtor had no documents to support this testimony. Weiss, on the other hand, had business records available to support his testimony that only 10,300 pounds had been questioned. As to that quantity, Debtor kept the steel in exchange for a $1700 credit against LEI's account with Weiss. Debtor also testified that LEI had paid between $18,000 and $19,000 in cash toward this obligation, for which no credit had been given. Once again, Debtor had no documents, receipts or records of any kind to verify his statement, while Weiss had records that reflected no such cash payments had been made.[4] Next, Debtor asserted that one certified check made payable to Avenue Check Cashing in the amount of $4,200 was actually cashed by Weiss. Curiously, despite having produced at trial numerous original checks, Debtor has only a photocopy of the front of this one. The photocopy showed no indorsement of any kind but did contain a notation that it was "payable only as originally drawn and when properly indorsed...." Weiss denied ever having received this $4,200. The court finds the facts to be as represented by Mr. Weiss. If Plaintiffs establish the elements of § 523(a)(2)(A), (a)(2)(B), or (a)(6), the obligation will be nondischargeable if it is an obligation of this Debtor.

### Section 523(a)(6)

The court finds that the Plaintiffs have not met their burden of proof under 11 U.S.C. § 523(a)(6). Section 523(a)(6) provides for nondischargeability of a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." In *Kawaauhau v. Geiger*, — U.S. —, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), the Supreme Court defined "willful" as modifying the word "injury". In the Court's view, this means that the injury itself must be intentional or deliberate. A finding that the act leading to the injury is deliberate or intentional is not enough to find the claim

---

**3.** On October 2, 1995, Debtor pled *nolo contendere* to having issued six "NSF" checks. He was ordered to pay restitution to Weiss in the amount of $4,470 and court costs over 11 months, which he did. The order of restitution and the face amounts of the six checks involved in the plea agreement are not the same. The checks actually total $5,470. The district attorney's motion to *nol pros* the additional 5 counts of the Bill of Information was granted.

As a basis for a finding of nondischargeability of this debt Plaintiffs cite the *nolo contendere* plea in their Complaint. *See* Complaint at ¶ 8, 9. However, in civil matters such as nondischargeability actions, a plea of *nolo contendere* does not foreclose the defendant, Debtor in this case, from contesting the facts charged in the criminal indictment. *See Commonwealth v. Jones*, 375 Pa.Super. 194, 544 A.2d 54, 57–58 (1988)(concerning Fed.R.Evid. 410, plea of *nolo contendere* generally inadmissible in civil proceeding); *Eisenberg v. Commonwealth Dept. of Public Welfare*, 86 Pa.Cmwlth. 358, 485 A.2d 511 (1984), *aff'd* 512 Pa. 181, 516 A.2d 333 (1986)(generally, plea of *nolo contendere* cannot be used as an admission against the pleader in a civil suit); *Commonwealth v. Jackson*, 248 Pa. 530, 94 A. 233, 235 (1915)(plea of *nolo contendere* accompanied by protestation of innocence does not preclude defendant in civil suit from contesting facts charged in indictment).

**4.** Debtor's counsel remarked during closing statements that even he had not heard about the alleged cash payments before Debtor testified at trial.

nondischargeable. The injury itself must be intended. ── U.S. at ──, 118 S.Ct. at 977.

▮ Malicious injury is defined as that which is "wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will." *In re Conte*, 33 F.3d 303, 308 (3d Cir.1994). Malicious conduct is signified by behavior engaged in with a conscious disregard of one's duties or without just cause or excuse. *In re Pugliese*, 211 B.R. 173, 175 (Bankr.M.D.Pa.1997), citing *In re Galizia*, 108 B.R. 63, 69 (Bankr.W.D.Pa. 1989).

▮ Assuming, for purposes of argument, that Debtor's issuance of "NSF" checks qualifies as malicious behavior, there is no indication that he acted willfully; i.e., with intent to cause harm to Plaintiffs. Both prongs must be met, inasmuch as the section is written in the conjunctive. Accordingly, the debt has not been shown to be the result of willful *and* malicious injury. Therefore, the debt cannot be found to be nondischargeable under § 523(a)(6).[5]

### Section 523(a)(2)

Plaintiffs next contend that this case falls within 11 U.S.C. § 523(a)(2)(A) or (a)(2)(B). These sections provide that

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt ...

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing

(I) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

Nondischargeability must be established by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). We first address § 523(a)(2)(A).

### Section 523(a)(2)(A)

To prove nondischargeability under § 523(a)(2)(A), Plaintiffs must establish that Debtor engaged in false pretenses, false representation or actual fraud on which Plaintiffs justifiably relied and by which they were damaged. *See Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995); *In re Feld*, 203 B.R. 360 (Bankr.E.D.Pa.1996).

▮ In *In re Edwards*, 143 B.R. 51 (Bankr.W.D.Pa.1992), the court refused to adopt a *per se* rule with respect to "NSF" checks and held that the mere issuance of an NSF check was not a fraudulent misrepresentation sufficient to sustain a finding of nondischargeability under § 523(a)(2)(A). The creditor must instead prove each element of § 523(a)(2)(A). These are

(1) the debtor made a material misrepresentation which

(2) he knew was false or made with reckless disregard of the truth

(3) with the intent to deceive the creditor

(4) the creditor justifiably relied on the misrepresentation [6]

(5) the creditor suffered damage.

---

**5.** In their brief filed August 31, 1998, Plaintiffs assert that because "willful and malicious injury encompasses the tort of conversion" (citation omitted), and because Lahiri "intentionally converted the raw steel", he "committed the tort of criminal conversion" and, therefore, the debt is nondischargeable. Plaintiffs' argument fails on two grounds: (1) Plaintiffs failed to establish willful and malicious injury under *Kawaauhau v. Geiger, supra;* and (2) the testimony at trial concerned only the NSF checks, not conversion.

**6.** The court in *In re Edwards* held that the creditor's reliance must be reasonable. The case was decided before the Supreme Court opinion in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), was rendered in which the Court held that under § 523(a)(2)(A) the creditor need only establish justifiable reliance. In the instant Memorandum Opinion we apply the justifiable reliance standard decreed by the Supreme Court, as discussed *infra*.

In *In re Edwards,* 143 B.R. 51 (Bankr. W.D.Pa.1992), the court held that the debt was nondischargeable because the debtor had assured the creditor that he had sufficient funds to cover the check he wrote to purchase an automobile. · See also *In re Guest,* 193 B.R. 745 (Bankr.E.D.Pa.1996), wherein the court also adopted a flexible approach and concluded that the mere issuance of a check upon insufficient funds is not enough to sustain a finding that the claim at issue is nondischargeable.

*In re Anderson,* 181 B.R. 943 (Bankr. D.Minn.1995), is consistent with *Edwards.* The court in *Anderson* held that uttering a bad check could render the debt nondischargeable under § 523(a)(2)(A) if the creditor met its burden of proof. That is, the creditor must establish that the debtor acted under false pretenses, or made a false representation, or committed actual fraud. In *Anderson,* the debtor wrote a series of checks to obtain cash in order to gamble at a casino, although he did not have the funds or any other assets to back up the checks. The debtor was aware of the state of his finances at the time. The court noted that false pretenses, false representations and actual fraud, while treated in many cases as indistinguishable, are actually distinct events. The court in *Anderson* recognized that "false pretenses" is a more passive means than false representations or actual fraud. False pretenses is described as

> a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor. "False pretense" may, but does not necessarily, include a written or express false representation. It can consist of silence when there is a duty to speak.

181 B.R. at 950, quoting *In re Dunston,* 117 B.R. 632, 641 (Bankr.D.Colo.1990), *modified* 146 B.R. 269 (D.Colo.1992) (due to standard of proof announced in *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)). The court concluded that the creditor had met its burden under § 523(a)(2)(A).

Even though casino personnel never inquired as to whether the debtor's checks were good and even though the debtor never affirmatively represented that he had available funds, the court concluded that

> [b]y blithely issuing dozens of his checks to a long succession of such [casino] personnel, allowing them to process them, and then readily accepting the cash that he sought, the Defendant [debtor] actively created the semblance that every single check was backed by value on deposit which the casino could recover by presenting the check for payment. The pretense that accompanied his tender of the instruments was that his bank would honor them, when, as, and whenever [the creditor] presented them ....

181 B.R. at 951. Thus, the debt was held to be nondischargeable.

With respect to false representations, the debtor must have knowledge of the falsity, intend to induce the plaintiff to act or refrain from acting based on the misrepresentation, the plaintiff must have justifiably relied on the misrepresentation, and must have suffered damages. *In re Feld,* 203 B.R. 360, 365 (Bankr.E.D.Pa.1996). Actual fraud is defined as any deceit or design with the intent to cheat, including silence, concealment, or nondisclosure. *In re Rodgers,* 1993 WL 393071 (Bankr.W.D.Pa.1993).

■ In the matter before us, we find that Debtor issued checks on LEI's bank account knowing that there were insufficient funds to cover them. Debtor did so to induce Plaintiffs to sell and deliver steel. We also find that he engaged in fraudulent misrepresentations to induce Plaintiffs to do business with his corporation and that Plaintiffs were damaged by Debtor's conduct. The misrepresentations include assertions that the "NSF" checks would be replaced and were not. In addition, Debtor induced Weiss to order new product for LEI by asserting that Debtor needed it to prove that he was complying with a large contract to manufacture doors. Debtor also told Weiss that he was involved in a law suit concerning a breach of performance and that if Weiss would procure the steel for him, he was sure to win the suit because he could establish that he was not in

breach. As in *Anderson,* Debtor engaged in a pattern of writing bad checks interspersed with those for which there were sufficient funds. Debtor, on behalf of LEI, had developed a pattern of partial payment interspersed with "NSF" checks. He was a personal friend of Weiss's as well as a business associate and Debtor's continual promises to pay back the "NSF" checks, coupled with partial payments toward them through replacement checks, were sufficient to induce and justify Weiss's conduct under the circumstances. Weiss established that LEI still owed him more than $80,000 for steel. We find that Plaintiffs have established that Debtor engaged in false pretenses and false representations.

■ Taking all circumstances into account, we also find that Plaintiffs justifiably relied on Debtor's promises of payment and his other misrepresentations. Justifiable reliance is defined by the Supreme Court in *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Although that case concerned actual fraud, its pronouncement concerning justifiable reliance has been relied upon by the courts for § 523(a)(2)(A) purposes in general.

> Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case.

516 U.S. at 71, 116 S.Ct. at 444. Further, reliance can be justified even though the plaintiff could have ascertained the falsity of the representations if the plaintiff had investigated. We think that under the circumstances of this case justifiable reliance existed. Debtor and Weiss had a personal relationship, in addition to their business relationship. Debtor made some payments and made representations regarding further payments, another business venture, and a lawsuit to induce further action by his friend. Thus, these elements of § 523(a)(2)(A) were established. *But see* discussion, *infra,* "Whose Debt Is It?"

### Section 523(a)(2)(B)

■ The next question to be addressed is whether the check is a "statement in writing" for purposes of § 523(a)(2)(B). The cases typically rely on *Williams v. U.S.,* 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), and state that a check is not a "statement in writing" for purposes of § 523(a)(2)(B). In *Williams,* the defendant had engaged in a check kiting scheme and the government charged him with a violation of 18 U.S.C. § 1014 which criminalizes knowingly making any false statement or report in order to influence certain federally insured banks to grant credit. The Supreme Court held that a check is not a "statement or report" for purposes of 18 U.S.C. § 1014 because it contains no factual assertions. Although a check can be considered an implied representation that the amount represented thereon is on deposit, it also can be considered an implied promise to have sufficient funds in the drawee bank at the time that the check is presented for payment.[7]

Many of the cases discussing whether a check is a "statement" are under § 523(a)(2)(A) and conclude that checks are not statements, based on *Williams.* The Court of Appeals for the Seventh Circuit, relying on *Williams,* held that knowingly passing a bad check does not constitute false pretenses or a false representation. *Matter of Scarlata,* 979 F.2d 521 (7th Cir.1992)(a chapter 7 case under § 523(a)(2)(A) in which the Chicago Board of Exchange brought an adversary action objecting to dischargeability of a debt). In the Eleventh Circuit, the Bankruptcy Court for the Northern District of Alabama held, on the facts of the case before it, that issuance of an "NSF" check was not an implied representation that there were sufficient funds on deposit to cover the check. *In re Mahinske,* 155 B.R. 547 (Bankr.N.D.Ala.1992).[8] The check is simply

---

7. Under Pennsylvania statute, issuing a bad check is not always a punishable criminal offense. *See* 18 Pa.Cons.Stat.Ann. § 4105. The statute also provides a "breathing space" under certain conditions which can result in avoidance of criminal penalty.

8. *Mahinske* is distinguishable, however, because in that case the debtor requested that the plaintiff hold the checks until the debtor received funds from another source that he would deposit to cover the checks. Thus, the plaintiff in *Mahinske* knew when he accepted the checks that they would not be honored if he deposited them im-

an order upon the drawee bank. *In re Roberts*, 82 B.R. 179, 184 (Bankr.D.Mass.1987). Checks are not statements supplying information but are negotiable instruments, a form of contract, which evidence debt. They are a form of contract that creates rights. *In re Paulk*, 25 B.R. 913, 917–18 (Bankr.M.D.Ga.1982)(discussing § 523(a)(2)(B)). A check "is not a factual statement at all". *Williams v. U.S.*, 458 U.S. at 284–85, 102 S.Ct. at 3091. Based on the weight of authority, we find that the checks in issue are not "statements in writing" for purposes of § 523(a)(2)(B) (nor are they "statements" for purposes of § 523(a)(2)(A)).

### Whose Debt Is It?

 Even if the contrary were true, we are compelled to find that the debt is dischargeable as the issue is presented in this adversary proceeding. This is so even though Plaintiffs established that Debtor engaged in false pretenses and false representations under § 523(a)(2)(A). Section 523(a) provides that an individual is not discharged from certain debts. Unless the liability is Debtor's, § 523 does not apply to render the obligation nondischargeable. The debt has not been established to the obligation of this individual Debtor.

 The Bankruptcy Code provides that debts to be discharged must be those of the debtor.[9] In the matter before us Debtor signed the checks in his corporate capacity. When a signature shows unambiguously that it was made in a representative capacity, the representative is not liable. 13 Pa.Cons.Stat. Ann. § 3402(b)(1). *See also McKee v. Moon*, 400 Pa.Super. 161, 583 A.2d 5 (1990)(individu-

al acting as agent for disclosed principal is not personally liable on a contract between the principal and a third party unless the individual specifically agrees to assume liability). Further, it is the creditor's burden to prove that the individual is the real party in interest. *Cf. Levy v. Conly*, 340 Pa. 332, 334, 17 A.2d 382, 383 (1941)(where, at the inception of the transaction, there is a disclosed principal, the principal alone is liable for breach of contract). *See also Vernon D. Cox & Co., Inc. v. Giles*, 267 Pa.Super. 411, 415, 406 A.2d 1107, 1110 (1979)("[i]t is a basic tenet of agency law that an individual acting as an agent for a disclosed principle is not personally liable on a contract between the principle and a third party unless the agent specifically agrees to assume liability").

 The evidence at trial substantiated that although Debtor and Weiss were the two active participants in putting together their business deals, the contracts for the purchase of steel were actually made on behalf of Debtor's corporation, LEI Products Corporation, and the checks issued to pay the invoices were drawn on bank accounts of that corporation. There was no evidence that Debtor had any personal obligation to pay the invoices or that he transacted business for anyone other than his corporation, LEI Products Corporation. There was no guarantee or suretyship agreement entered into by the parties. No security interest was conveyed to Mega Enterprises or to Weiss. No evidence was introduced to establish that Debtor utilized the corporation as an alter ego and the complaint did not allege a count to pierce the corporate veil.[10] The evidence

mediately. The court then examined the question of whether the mere issuance of the check itself was sufficient under § 523(a)(2)(A) and concluded, on the basis of *Williams v. U.S., supra*, that it was not.

**9.** In their brief, Plaintiffs argue that because Debtor failed to raise as an affirmative defense the issue of whether the debt was his or the corporation's he is precluded now. Plaintiffs' argument is misapplied. Whether Debtor raises the issue or not, under § 523(a) Plaintiffs must establish the debt to be that of the Debtor and this court must apply the law.

**10.** Factors to determine whether the corporate veil should be pierced or whether one corporation is the alter ego of another include ignoring

corporate formalities, gross undercapitalization, a lack of corporate records, non-functioning officers and directors, non-arms-length transactions, and day-to-day control sufficient to deprive the alter ego of its corporate identity. *Ragan v. Tri–County Excavating, Inc.*, 62 F.3d 501, 516 (3d Cir.1995)(Hutchinson, J., dissenting). The creditor has the burden of presenting "clear, direct, precise and believable evidence that the corporate veil should be pierced." *Id.* (citation omitted). The decision to pierce the corporate veil is to be arrived at cautiously. *Id.* (citation omitted). No evidence of any of these factors was adduced at trial.

did not establish to a preponderance that the underlying obligation to pay for the steel is Debtor's. The testimony and documents all reflected that invoices were issued by Mega Enterprises, Inc. to LEI Products Corporation. The checks issued in payment were those of LEI Products Corporation. If Debtor had the obligation to pay, the evidence amply supports non-dischargeability under § 523(a)(2)(A). However, Debtor signed the checks only in his representative capacity. Thus, although we credit the Plaintiffs' evidence, we cannot declare this debt to be nondischargeable under § 523(a) as to this individual debtor because we cannot find that he had the obligation to pay it.[11]

Based on the foregoing, the objection to dischargeability is denied.[12]

---

**11.** Plaintiffs established that a default judgment had been entered against Debtor. But for the fact of the judgment, no evidence was introduced concerning the default judgment against Debtor in favor of Mega Enterprises, although a copy of the complaint that led to the judgment was attached to the complaint filed in this Adversary. In essence, the complaint involves the "NSF" checks and damages associated therewith. Of the five counts of the state court complaint, the first contains no substantive prayer for relief. The factual allegations are related therein. The second is a breach of contract. The third is captioned "Fraud/Conversion." The next (actually labeled as a second "Count III") also discusses "Fraud & Conversion." However, the record does not reflect any findings of fact made by the Court of Common Pleas. At trial, the parties agreed that the judgment is on appeal to the Superior Court of Pennsylvania, although that court may be stayed from considering it while this bankruptcy is pending. Count IV sounds in fraud and Count V alleges the tort of business interference. The judgment makes no reference to any count of the complaint, and it is impossible to tell, on the record before the court, the legal or factual basis for the judgment. Furthermore, not all counts of the state court complaint are directed against Debtor. Entry of default judgment in a fraud action can, under certain circumstances, collaterally estop a debtor from relitigating the matter in a dischargeability action. *See, e.g., In re Docteroff*, 133 F.3d 210 (3d Cir.1997) (where default judgment entered as sanction for willful obstruction of discovery and defendant had "every opportunity to fully and fairly litigate any relevant issue", defendant is collaterally estopped from litigating in subsequent action; court weighed public's and litigants' interests in having a decision on the merits against deterring future abuses). However, we do not reach this issue inasmuch as we find that the debt subject to the nondischargeability complaint is not that of Debtor.

**12.** LEI Products Corporation was not joined as a party in this proceeding. Nothing herein prohibits Plaintiffs from taking appropriate action against LEI.