**In re John Edwin PAULK, Debtor.**

**HEINOLD COMMODITIES, INC., Plaintiff,**

v.

**John Edwin PAULK, Defendant.**

**Bankruptcy No. 82–20012–AMER.
Adv. No. 82–2018–AMER.**

United States Bankruptcy Court,
M.D. Georgia,
Americus Division.

Dec. 22, 1982.

See also 25 B.R. 913.

Michael A. Fennessy, Myers, Fennesy & Skipper, Americus, Ga., for plaintiff.

Howard S. McKelvey, Crisp, Oxford & Gatewood, Americus, Ga., for defendant.

COMPLAINT OBJECTING TO DISCHARGE OF DEBTOR OR TO DETERMINE DISCHARGEABILITY OF DEBT

ALGIE M. MOSELEY, Jr., Bankruptcy Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff seeks nondischargeability of its debt under 11 U.S.C. § 523(a)(2)(A), false pretenses or false representations; under 11 U.S.C. § 523(a)(2)(B), a false statement in writing—a check; under 11 U.S.C. § 523(a)(2)(B), a false statement in writing—items in an application; and Plaintiff seeks denial of Debtor's discharge under 11 U.S.C. § 727(a)(2)(A), a transfer of one-half interest in real estate. Herein, it is found that Plaintiff's debt is dischargeable and that Debtor's discharge should not be denied.

## UNDER 11 U.S.C. § 523(a)(2)(A)—FALSE PRETENSES OR FALSE REPRESENTATIONS

## UNDER 11 U.S.C. § 523(a)(2)(B)—A FALSE STATEMENT IN WRITING—A CHECK

Debtor filed his Chapter 7 case on February 1, 1982 and scheduled a debt of $42,571 to Plaintiff, hereinafter "Heinold," which debt was scheduled as disputed and unsecured. The debt to Heinold arose generally out of a course of commodity future trading engaged in between Debtor in a margin account with Heinold. Debtor claims that Heinold is indebted to him for a margin account balance of $5,360.25.

Debtor is a postal clerk and had traded in commodity future contracts of various types beginning sometime in 1979. Early in 1980 Debtor attended a farm implements and equipment exhibition in Moultrie, Georgia where he visited a booth set up by Heinold and witnessed a "pig race" staged by Heinold. As a result of Debtor's conversations with Heinold employees, Debtor set up an account with Heinold in February or March of 1980. Until late 1981, Debtor traded with Heinold, and he traded only one or two contracts at a time. Debtor did considerable "day trading" by which he would buy one or more contracts and resell the same trading day. The Debtor's registered representative with Heinold for all relevant times was David Dornseif in Chicago, Illinois. Communications between Debtor and Dornseif were almost exclusively by telephone to and from Fitzgerald, Georgia. In October or November of 1981 Debtor and Dornseif began talking about the Debtor expanding his relationship with Heinold to one which anticipated a larger volume of trading. Debtor and Dornseif agreed that the Debtor would be given a volume discount on an increased volume of trading but that Debtor would, as a prerequisite to trading in larger volumes, have to post a substantially higher amount of money as a margin deposit. On December 3, 1981, the Debtor executed a check in the amount of $40,000 payable to Heinold. Mr. Fox with Heinold testified this check was in possession of Heinold in Chicago the afternoon of December 3. Dornseif testified the Margin Department of Heinold notified him at 8:40 E.S.T. on December 4 that the check had been received. The check was issued as additional margin money for the anticipated expanded trade volume. On December 3, 1981, when the check was issued, Debtor had less than $1,000 in his account at National Bank of Fitzgerald. Debtor, however, had an informal "line of credit" with the bank to the extent that the bank had made a practice on numerous occasions to honor Debtor's overdrafts. At the time that the check was issued Debtor was having discussions with a bank officer, a Mr. Crawley, towards expanding his "line of credit" to cover the check or extend a formal loan to cover the check. At the time of issuance of the check no agreement existed between Debtor and bank which bound the bank to pay the check other than the past dealings between the bank and Debtor.

On the afternoon or early evening of December 3, 1981, the Debtor and Dornseif

had a telephone conversation and the substance of this conversation is hotly disputed. Dornseif testified that the Debtor was convinced a certain segment of the commodities market was about to go up, and Debtor placed an order with him (Dornseif) to buy a substantial sum of future contracts at the prevailing price of the market on opening of the next trading day. Dornseif testified that he accepted the order contingent on the arrival of the check. Debtor, however, testified that he and Dornseif merely discussed the market conditions and he (Debtor) definitely placed no order.

On the morning of Friday, December 4, 1981, before the market opened, Heinold's bookkeeping department notified Dornseif that Debtor's check had arrived. At 9:02 a.m. E.S.T., 8:02 C.S.T., Dornseif placed the orders for Debtor's account pursuant to his understanding of the conversation the evening before. At 8:50 a.m. E.S.T. Dornseif received a telephone call from Debtor's wife, the latter having been instructed by Debtor, who was at work and could not make the call himself, to make the telephone call. The substance of this conversation is also hotly disputed. Dornseif testified that the message that Mrs. Paulk delivered was for 100 contracts, that it was confusing and not clear enough for him to act upon and further he could not act on it since Mrs. Paulk had no right of control over the account. Dornseif testified that he told Mrs. Paulk this. Mrs. Paulk, however, testified that she read the message for 10 contracts as she was told to do by Mr. Paulk and Dornseif gave no indication that anything was wrong with it. The message was in the nature of a limit order, one which could be filled by buying a contract only at a stated price or lower. Dornseif took no action with reference to Mrs. Paulk's message. This message was written down by Mr. Paulk (Exhibit D–5) and Mrs. Paulk simply read this message to Dornseif.

At 9:30 a.m. E.S.T. on December 4, 1981 Debtor's account had 20 commodity futures contracts on treasury instruments and GNMA instruments with a face value of $2,000,000. At about that time Dornseif telephoned the Debtor to confirm that the purchases had been made. The substance of this conversation is hotly in dispute. Debtor testified that he told Dornseif at that time that the contracts had been purchased in error as there had been no authorization for them. Dornseif, in his testimony, denied that the Debtor said this.

Later in the morning Heinold's Margin Department attempted to verify the $40,000 check with the drawee bank and thus learned that there were insufficient funds in the account to cover the check. This was reported to Dornseif who immediately reported to his superior, a Mr. Fox. The result was a flurry of telephone calls between the Debtor, Dornseif, Fox, and Debtor's banker, Mr. Crawley. The timing and substance of these telephone calls is not clear. The testimony of Mr. Fox is that Mr. Crawley reported to him that the check would be made good on the statement of Mr. Crawley to "send it through." During these telephone conversations Debtor, however, made no representations that the check was good. His only statements were to Fox that Fox should call Mr. Crawley at the bank. The banker, Mr. Crawley, was not called as a witness, and no testimony is in the record from Mr. Crawley.

All during that day of Friday, December 4, 1981, and the morning of the next business day, Monday, December 7, 1981, the market moved against the Debtor's positions, and his account lost money at a rapid rate. Early in the morning of December 7, 1982 at Heinold's suggestion, Debtor "spread" his position as to half of the contracts he held, neutralizing his risk as to these contracts. A little later on December 7, Mr. Fox, understandably being "edgy" about the situation, called Mr. Crawley once more. Mr. Fox solicited further assurances from Mr. Crawley that the check would be honored, but no such assurances were forthcoming. Mr. Fox took control of the Debtor's account and "spread" the balance of the Debtor's position. By that time, shortly before 11:00 a.m. on December 7, Debtor's account showed a loss of $48,000. Heinold promptly liquidated the Debtor's position and closed the account. When all the rele-

vant bookkeeping had been done, Debtor's cash balance was $5,360.25 which was credited against the losses. Debtor had a net deficit of $47,931.25. The Debtor, contending that he never authorized any of the trades on December 4 and December 7, contends that he is entitled to recover $5,360.25 from Heinold.

From the foregoing, the Court is to determine if the debt from Paulk to Heinold is nondischargeable under 11 U.S.C. § 523(a)(2)(A) as false pretenses or false representations and if it is also nondischargeable under 11 U.S.C. § 523(a)(2)(B), a false statement in writing. The Court finds as a fact that Heinold has failed to carry its burden of proof on each of these issues and Paulk has failed to carry his burden of proof on his counterclaim. The principal evidence is based on three of many telephone conversations between the parties, Paulk in Fitzgerald, Georgia and Heinold in Chicago. The first conversation was on the evening of December 3 when Heinold says Paulk placed an order and Paulk says he did not place an order. The second telephone conversation was in the early morning of December 4 when Mrs. Paulk read a message to Mr. Dornseif placing a limited order. Mr. Dornseif said Mrs. Paulk's message was confusing and ridiculous in that it placed an order for 100 contracts. Mrs. Paulk says that she read the message for 10 contracts exactly as appears on Exhibit E–5. The third conversation was a little later in the morning on December 4 after certain contracts had been purchased by Dornseif for Paulk. The Debtor told Dornseif at that time that the contracts had been purchased in error, and Dornseif says that the Debtor made no such statement. If the account had been liquidated at the time of this third conversation, rather than on December 7, Paulk's account would have been at about the breakeven point. Also, from the testimony there appears to be no satisfactory explanation of how a check written on December 3 could be in Chicago in the afternoon of December 3 or even delivered to Heinold in Chicago by 7:40 a.m. C.S.T., 8:40 E.S.T. To further confuse the situation there are innumerable marks or stamps on the check in question—most of which are illegible. There appears to be a "charge-back." There also appears to be a "redeposit," and it is not disclosed from the testimony the meaning of these words or the dates on which these events occurred. Further, all of the testimony points to statements or activities of Mr. Crawley at the bank, but Mr. Crawley never testified although he was listed as a witness in the Pre-trial Order to be called by Plaintiff Heinold. Also, testimony regarding the check in question as to date of arrival, the deposit thereof, the charge-back, the redeposit, etc., was important in the resolution of these issues in this case. Matters concerning the check were handled by the Margin Department of Heinold, but there was no testimony by any person from the Margin Department although the Pre-trial Order shows that Plaintiff Heinold intended to call a witness from that department, but no such witness testified. The burden of proof has not been carried by the Plaintiff, and this is particularly so because the burden of proof here is in the nature of fraud and such burden is by clear and convincing evidence.

Traditionally, the debtor's "fresh start" is one of the primary purposes of the bankruptcy law, and consequently, exceptions to discharge must be strictly construed. *Matter of Vickers,* 577 F.2d 683, 687 (10th Cir. 1978) *citing to Gleason v. Thaw,* 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915) and other cases; *In re Huff,* 1 C.B.C.2d 171, 173 (B.Ct.Utah 1979). Consequently, courts have required a higher standard of proof, that is, "clear and convincing evidence." *See In re Huff, supra; Brown v. Buchanan,* 419 F.Supp. 199 (E.D.Va.1975) (citing cases). The same standard of proof has been applied generally under the Code. *See, e.g., In re Neuman,* 13 B.R. 128 (Bkrtcy.E.D.Wis. 1981) (proof by "clear and convincing evidence" required); *In re Stone,* 11 B.R. 209 (Bkrtcy., S.C.1981) (proof by "clear, cogent and convincing" evidence required). This standard has been specifically applied in cases dealing with N.S.F. checks. *See In re Lo Bosco,* 14 B.R. 739, 742 (Bkrtcy.E.D.N.Y.

1981) (proof by "clear and convincing" evidence required). If the evidence is in equilibrium, then the debt must be discharged. See the well-reasoned opinion of Chief District Judge Alexander A. Lawrence in *In re Conner,* 2 BCD 288 (D.C.S.D.Ga.1976) and see also *In re Nichols,* 17 B.R. 470, 471 (Bkrtcy.M.D.Fla.1981).

Accordingly, the Court finds, as a matter of fact and of law, that the Plaintiff has failed to carry its burden of proof by failing to prove its allegations by clear and convincing evidence.

### UNDER 11 U.S.C. § 523(a)(2)(B)—A FALSE STATEMENT IN WRITING—ITEMS IN APPLICATION

█ Plaintiff contends also that Exhibit P–1, which is a customer application signed by Defendant Paulk on February 3, 1981, ten months in advance of the transactions in issue here, contains a false statement in writing under 11 U.S.C. § 523(a)(2)(B). This application states a great many things and is not a typical financial statement. Blocks checked by the Debtor show that he has an annual income between $25,000 and $75,000 per year, a net worth between $50,000 and $100,000, and that he has risk capital of $20,000. Nothing else on this application is significantly related to Paulk's "financial condition" as those words are used in 11 U.S.C. § 523(a)(2)(B). Here again, Plaintiff has failed in its burden of proof by failure to present clear and convincing evidence that these statements are false. Even if such burden had been carried, Heinold did not "reasonably" rely on such statement. For the first ten months of Paulk's association with Heinold, Paulk did minimal trading, and the transactions in question anticipated a substantial increase in the volume of trading. To rely on the statements made ten months earlier under changed conditions of increased volume of trading, if Heinold in fact did rely on these statements, was not a reasonable reliance. Indeed, under any circumstances it would be unreasonable reliance on these minimal statements in the application made only by the checking of blocks.

### UNDER 11 U.S.C. § 727(a)(2)(A)— TRANSFER OF ONE-HALF INTEREST IN REAL ESTATE

█ Plaintiff Heinold contends further that the discharge of Debtor Paulk should be denied under 11 U.S.C. § 727(a)(2) because in October of 1981 he conveyed a one-half interest in a ten-acre tract of land to his wife. Paulk and his wife assert that the land has always been land belonging exclusively to Mrs. Paulk. Mrs. Paulk at the time of her marriage to Mr. Paulk was a widow with three children and having a separate estate of her own. As a result of the death of her husband she owned the ten-acre unimproved tract of land. She also owned a home valued at about $45,000 and had cash in the amount of about $80,000 and other property. She and Mr. Paulk were married in February of 1979, and later in that year she undertook to build a new home on this ten-acre tract of land. Mr. Paulk had lived in Fitzgerald, Georgia for many years; Mrs. Paulk had only recently moved to the Fitzgerald, Georgia area and was not known in the community as was her husband, Mr. Paulk. In making arrangements for a construction loan and for permanent financing, one of the conditions of the loan commitments was that she convey one-half interest in the land to her husband and jointly they would execute the note and security deed. No consideration passed from Mr. Paulk to Mrs. Paulk for the conveyance of this one-half interest in the ten-acre tract to Mr. Paulk. A loan resulted in the amount of $42,000, and Mrs. Paulk, from her separate estate, has made all the payments on this loan. The deed to Mr. Paulk was made in November of 1979, and it was understood between Mr. and Mrs. Paulk on advice of her attorney that Mr. Paulk would reconvey the one-half interest to Mrs. Paulk within one year. The reconveyance did not occur in 1980, and Mrs. Paulk being aware that Mr. Paulk had an ex-wife and children by a previous marriage and that should he predecease Mrs. Paulk some claim might be made by the ex-wife and previous children to the real estate. The November, 1979 deed to Mr. Paulk was not a gift but was a vehicle to obtain financing, and when Mr. Paulk re-

conveyed the one-half interest in October of 1981, it also was without any consideration. The hazard insurance policy on the newly constructed home was owned entirely by Mrs. Paulk, and she was the named beneficiary. Mr. Paulk was not a beneficiary on this hazard insurance policy. Mr. Paulk in October of 1981 was going off on duty with the National Guard, and her attorney also advised her that for this additional reason that it was time for her to get her things in order. At no time did Mrs. Paulk know the details of Mr. Paulk's trading in commodities, although she did know that he was doing some trading. In October of 1981, there is no evidence that Mr. Paulk was insolvent or in financial difficulty.

From the foregoing facts it is clear that any interest that Mr. Paulk had in the ten-acre tract of land was held in trust for his wife, and he had no beneficial interest other than holding the one-half interest as an implied trust in favor of his wife. The transfer of Mr. Paulk's one-half interest in October of 1981 to his wife was merely the termination of the trust arrangement, and the transfer is not one proscribed by 11 U.S.C. § 727(a)(2). *See In re Gaites,* 466 F.Supp. 248 (D.C.M.D.Ga.1979).