In re Ralph VAIRO, Debtor.

LINCOLN FIRST BANK, N.A., Plaintiff,

v.

Ralph P. VAIRO, Defendant.

Bankruptcy No. 83 B 20460.
83 Adv. 6187.

United States Bankruptcy Court,
S.D. New York.

June 8, 1984.

McCarthy, Fingar, Donovan, Drazen & Smith, White Plains, N.Y., for Lincoln First Bank, N.A.

Jeffrey L. Sapir, Yonkers, N.Y., for debtor.

## DECISION ON COMPLAINT OF LINCOLN FIRST BANK, N.A. FOR DENIAL OF DISCHARGE AND DISCHARGEABILITY.

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The debtor's unsuccessful gamble in the purchase and sale of stock options resulted in a substantial deficiency owed to the plaintiff bank's discount brokerage department, which the debtor could not meet short of bankruptcy. The plaintiff bank responded to the debtor's Chapter 7 petition with a complaint objecting to his discharge under 11 U.S.C. § 727 and to the dischargeability of the bank's claim, pursuant to 11 U.S.C. § 523. The adversary matter was then set for trial resulting in the following:

### FINDINGS OF FACT

1. The debtor, Ralph Vairo, filed with this court his petition under Chapter 7 of the Bankruptcy Code on September 15, 1983, at which time he was indebted to the plaintiff in the sum of approximately $37,000. The debtor is employed as a claims investigator for a law firm in Westchester County.

2. The plaintiff, Lincoln First Bank, N.A. ("Lincoln"), is a national bank with various branches in New York, including a location in Yonkers, New York.

3. On August 31, 1981, the debtor opened a checking account with Lincoln's Yonkers' branch. Thereafter, on September 20, 1982, the debtor requested and obtained from Lincoln a $1,000 revolving line of credit and overdraft privileges known as "Ready Money" in connection with the checking account.

4. On February 15, 1983, the debtor was granted a "Visa" credit card with a $1,000 revolving line of credit from Lincoln as a result of a pre-approved invitation extended to existing customers of Lincoln.

5. On May 25, 1983, the debtor and Lincoln, through the latter's discount brokerage department, entered into a written agreement to deal in investment securities. The debtor also executed on May 25, 1983 a written margin agreement and on May 26, 1983 a written option agreement for use in connection with the debtor's activities with respect to his purchase and sale of investment securities.

6. On August 16, 1983, the debtor placed orders with Lincoln's discount brokerage department to purchase options for securities at a total price of $28,900.13, and then placed orders to sell such options for securities for a total of $27,678.32, resulting in a balance of $1,221.81 to be paid to Lincoln. Thereafter, on August 22, 1983, the debtor placed additional orders to purchase options for securities at a total price of $214.026. Later that day the debtor placed orders to sell the additional stock options for a total of $182,299.83, leaving a balance of $31,726.17 to be paid to Lincoln with respect to the additional stock options. The total balance owing to Lincoln by reason of the debtor's options transactions amounted to $35,346.86.

7. In addition to the $35,346.86 that the debtor owed to Lincoln through its discount brokerage department, the debtor incurred an obligation to Lincoln of $868.74 under the "Ready Money" account and $897.99 under the "Visa" credit card.

8. In order to induce Lincoln to extend credit under the "Ready Money" account, the "Visa" credit card and the purchase and sale of stock options, the debtor completed and submitted to Lincoln written statements regarding his financial condition. At the trial Lincoln did not offer any proof as to actual reliance with respect to the "Ready Money" account and the "Visa" card account, with the result that Lincoln

withdrew its causes of action for nondischargeability as to the "Ready Money" and "Visa" accounts. Accordingly, Lincoln directs its nondischargeability complaint against the debtor's obligation arising out of his purchase and sale of stock options. However, Lincoln's causes of action seeking a denial of the debtor's discharge under 11 U.S.C. § 727 encompass the totality of the debtor's obligations to Lincoln, including the "Ready Money" and the "Visa" credit card accounts.

9. The application that the debtor submitted to Lincoln as a condition for opening the stock options account reflects that he was employed by a law firm with an approximate annual income of "35,000+." The financial information required to be filled in for the "Option Account Information & Agreement" included the following:

```
"Estimated Annual Income
 (All Sources) 75,000
 Estimated Liquid Net Worth
 Securities 3,000
 Cash 50,000
 Investment Property 10,000
 Estimated Net Worth (Exclusive of
 Residence) 63,000"
```

The margin agreement that the debtor also submitted to Lincoln in order to be allowed to purchase and sell stock options through Lincoln's brokerage discount department contained the following information:

```
"Approximate Net Worth $75,000
 Approximate Liquid Assets $63,000"
```

10. The financial information that the debtor submitted to Lincoln in May of 1983 as part of the stock options agreement was materially false. The debtor's annual income was not $75,000 as listed. His gross income for 1981 and 1982 was $20,861.18 and $29,724. In 1983 the debtor's salary was $335.00 per week. He testified that his base salary and commissions produced an annual income of approximately $40,000 in 1983. The debtor admitted that he did not have $50,000 in cash as listed in the statement he submitted to Lincoln. The debtor's unbelievable explanation was that he regarded his salary as cash and since he thought he would earn in excess of $50,000 in salary, it followed that he should list this figure as part of his estimated liquid net worth. In light of the fact that the debtor is an experienced collections agent now employed by a law firm, it stretches credulity to believe that the debtor legitimately equated his salary with cash on hand. Additionally, the debtor did not own any investment property when he listed the sum of $10,000 in this category on the statement he submitted to Lincoln. His limp explanation was that his brothers and sisters had contemplated purchasing his mother's home and that he was to receive a one-sixth interest, which would amount to $10,000. However, the proposed purchase never occurred and the debtor never received any interest in his mother's home, although he listed this interest as an accomplished fact on the statement submitted to Lincoln. Admittedly, the debtor did not own any securities when he filed his bankruptcy petition on September 15, 1983, nor does it appear that the debtor owned any securities four months earlier when he submitted the financial statement to Lincoln in May, 1983, which recited that he owned securities valued at $3000.

11. The debtor had no justifiable basis for including in the margin agreement that he submitted to Lincoln that his approximate net worth was $75,000. Moreover, his statement in the margin agreement that his approximate liquid assets amounted to $63,000 was palpably untrue. The debtor's explanation was that he treated his salary as cash (which he incorrectly reflected as $50,000), and that he then added the $10,000 investment in property (which he did not then own and never thereafter acquired) together with securities valued at $3000 (of which there was no proof that the debtor then owned any securities of value). In short, the stated approximate net worth of $75,000 and the approximate liquid assets of $63,000 were mythical figures created by the debtor's optimistic expectations that never came to fruition, along with the

expected gains on the stock options transactions that the debtor failed to realize.

12. Lincoln reasonably relied upon the financial information submitted to it by the debtor. Lincoln's uncontradicted evidence established that it would not allow a customer to trade in options through Lincoln's discount brokerage department unless the customer had a net worth of not less than $50,000 and an annual income of not less than $25,000. Had Lincoln known that the debtor's gross income in 1981 and 1982 was $20,861.18 and $29,724 and that his net worth was substantially less than $50,000, Lincoln would not have accepted the debtor's orders to purchase and sell stock options.

13. The debtor's material misrepresentations as to his financial condition, as reflected in the written financial statements he submitted to Lincoln as part of his application to trade stock options, were relied upon by Lincoln to its detriment, namely, $35,346.86.

14. Lincoln's objection to the debtor's discharge pursuant to 11 U.S.C. § 727 is premised on the charges that the debtor owned a stamp and a coin collection which he did not list as an asset in his schedules (false oath, 11 U.S.C. § 727(a)(4)(A)) and with respect to which he failed to explain satisfactorily their loss or disposition (11 U.S.C. § 727(a)(5)). The debtor acknowledged he had owned stamps and coins at one time but that he disposed of his stamp and coin collections to his bookmaker more than one year prior to the petition in satisfaction of gambling debts. Lincoln's evidence fails to sustain its burden of proof under Bankruptcy Rule 4005, although the evidence is cumulative as to the debtor's lack of assets when he intentionally exaggerated his income and net worth in order to be permitted to trade stock options on a margin account through Lincoln's discount brokerage department.

## DISCUSSION

■ In view of the fact that there was no proof that the debtor owned a valuable stamp and coin collection when he filed his voluntary petition under Chapter 7 of the Bankruptcy Code, it necessarily follows that the charges in the complaint directed against the debtor's discharge bottomed on § 727(a)(4)(A) and § 727(a)(5) must be dismissed. Accordingly, the plaintiff's case must be decided on the basis of whether or not the debtor's obligation to the plaintiff, Lincoln, should be declared nondischargeable under 11 U.S.C. § 523(a)(2)(B) [1] because it was allegedly incurred through the use of a false statement in writing respecting the debtor's financial condition which was reasonably relied upon by Lincoln to its detriment and made with intent to deceive.

■ The plaintiff, Lincoln, has the burden of proving all of the essential elements of nondischargeability delineated under 11 U.S.C. § 523(a)(2)(B). Lincoln must establish: (1) the debtor's obligation, (2) that it was incurred by the use of a statement in writing, (3) that was materially false, (4) respecting the debtor's financial condition, (5) on which Lincoln reasonably relied and (6) that the debtor issued the statement with intent to deceive. These elements must be established by clear and convincing evidence. *In re Coughlin*, 27 B.R. 632, 636, 10 B.C.D. 266, 268 (Bkrtcy.App.Mass. 1st Cir.1983); *Household Finance Corp. v. Callery*, 6 B.R. 527, 529 (Bkrtcy.S.D.N.Y. 1980). There is little to dispute Lincoln's proof that its claim against the debtor for a deficiency in the debtor's stock options

1. § 523. Exceptions to discharge.
 (a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—
 (2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—
 (B) use of a statement in writing—
 (i) that is materially false;

 (ii) respecting the debtor's or an insider's financial condition;
 (iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and
 (iv) that the debtor caused to be made or published with intent to deceive.

transactions, amounting to $35,346.86, was predicated on a materially false statement in writing respecting the debtor's financial condition.

 The debtor is a sophisticated individual who has considerable experience in dealing with business figures and accounts. He is a claims investigator for a law firm and fully appreciates the significance of the need for accuracy in the reporting of financial information reflecting one's financial condition. His testimony that he treated his annual salary as cash for purposes of responding to Lincoln's financial questionnaire as to the amount of cash on hand was manifestly incredulous. Moreover, when the debtor included a contemplated interest in real estate as valued at $10,000, despite the fact that the interest never materialized and he was aware of this fact, he violated his "duty of fair dealing which arose when he undertook to consummate a business transaction with the Bank." *First National Bank of Elgin v. Nilles*, 35 B.R. 409, 411 (N.D.Ill.1983) (citation omitted). Having made an incorrect statement with respect to the real estate interest which the debtor knew did not exist, and with respect to which "he has reason to believe another is relying upon is under a duty to correct it." *Id.* (citation omitted). In the instant case the debtor intended that Lincoln should infer from the written financial information he submitted to Lincoln that the debtor owned $50,000 in cash, investment property worth $10,000 and, in addition to other nonexistent securities valued at $3,000, that the debtor's estimated net worth was approximately $63,000, all of which he knew was a total fabrication. This is not a case of reckless indifference or disregard of the accuracy of the information in a financial statement, which would suffice to show an intent to deceive. *See Morimura, Arai, & Co. v. Taback*, 279 U.S. 24, 32, 49 S.Ct. 212, 214, 73 L.Ed. 586 (1929); *Bank of Commerce v. Ebbin (In re Ebbin)*, 32 B.R. 936, 941 (Bkrtcy.S.D.N.Y. 1983); *In re Coughlin*, 27 B.R. at 636; *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Kimberly (In re Kimberly)*, 13 B.R. 145, 146 (Bkrtcy.S.D.Fla.1981). Here, the

incorrect information was such that the debtor should have known of its falsity. When a person knowingly makes a false representation which the person knows, or should know, would induce another to make a loan or extend credit, intent to deceive may logically be inferred. *Northern Trust Co. v. Garman (In re Garman)*, 625 F.2d 755, 763–64 (7th Cir.1980), *cert. denied*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981); *Carini v. Matera (In re Matera)*, 592 F.2d 378, 380 (7th Cir. 1979); *California State Employees' Credit Union No. 6 v. Nelson (In re Nelson)*, 561 F.2d 1342, 1347 (9th Cir.1977).

The debtor's reliance upon *Heinold Commodities, Inc. v. Paulk (In re Paulk)*, 25 B.R. 919 (Bkrtcy.M.D.Ga.1982), is misplaced. The debt at issue in *Paulk* arose in the course of commodity futures trading engaged in by the debtor on a margin account with the creditor, Heinold. The debtor submitted a customer application for the margin account which consisted of checking blocks designating broad ranges of annual income ($25,000—$75,000) and net worth ($50,000–$100,000) and stating his "risk capital" as $20,000. Ten months after this application was signed, the debtor suffered a substantial loss over a two day trading period. Heinold closed the margin account with a net deficit of approximately $48,000. The debtor then filed a Chapter 7 petition which was followed by Heinold's complaint objecting to the dischargeability of the debt under Code § 523(a)(2)(B) and the debtor's discharge under Code § 727(a)(2)(A). The court ruled that the plaintiff, Heinold, failed to meet its burden of proof because the statement in writing was not shown to be false by clear and convincing evidence. The statement simply consisted of "[b]locks checked by the Debtor show[ing] that he has an annual income between $25,000 and $75,000 per year, a net worth between $50,000 and $100,000, and that he has risk capital of $20,000. Nothing else on this application is significantly related to Paulk's 'financial condition' as those words are used in 11 U.S.C. § 523(a)(2)(B)." 25 B.R. at 923. Alternatively, the court found that it was unreasonable for Heinold to rely upon this

statement in view of the time lapse since the submission of the customer application and the substantial increase in the volume of trading by the debtor.

In contrast to *Paulk*, the debtor in the instant case was asked to provide estimations of various aspects of his financial condition including his annual income, liquid net worth consisting of securities, cash and other investment property and his overall net worth. The debtor's exaggerated estimations of these items were clearly false and more deliberate than the responses which the debtor in *Paulk* gave by means of "minimal statements in the application made only by the checking of blocks." *In re Paulk*, 25 B.R. at 923.

Therefore, the remaining issue for consideration is whether Lincoln reasonably relied upon such false representations in writing respecting the debtor's financial condition.

There was no evidence that Lincoln had any reason to know or suspect that the financial information which the debtor submitted to Lincoln in the written application for opening the stock options account was false or inaccurate. Lincoln should not be faulted for accepting net worth figures from someone who appeared to be an honest investor who had, for two previous years, maintained a checking account with the bank. In accordance with Lincoln's normal business practice it was not required to undertake an independent inquiry into the financial condition of an applicant for options trading when the figures furnished by the applicant did not disclose any facts that would cause Lincoln to believe that the applicant was dishonest or that the information was false. *See Northern Trust Company v. Garman (In re Garman)*, 625 F.2d at 763; *Merchants National Bank v. Denenberg (In re Denenberg)*, 37 B.R. 267, 272 (Bkrtcy.D.Mass.1983); *see also First National Bank of Colorado Springs v. Clancy (In re Clancy)*, 279 F.Supp. 820, 822–23 (D.Colo.1968), *aff'd*, 408 F.2d 899 (10th Cir.), *cert. denied*, 396 U.S. 958, 90 S.Ct. 430, 24 L.Ed.2d 422 (1969) (reliance found justifiable even though creditor failed to conduct further

inquiry). Accordingly, Lincoln's failure to view with incredulity the debtor's submitted figures as to his net worth does not render its reliance so unreasonable as to discharge the debtor's obligations.

## CONCLUSIONS OF LAW

1. Lincoln's causes of action directed to the denial of the debtor's discharge pursuant to Code §§ 727(a)(4)(A) and 727(a)(5) have not been sustained and are dismissed.

2. Lincoln did establish by clear and convincing evidence that the debtor's obligation in the sum of $35,346.86, which arose out of stock options transactions, was incurred by the use of a statement in writing that was materially false respecting the debtor's financial condition on which Lincoln relied and that the debtor issued such statement with intent to deceive.

3. The debtor's obligation to Lincoln in the sum of $35,346.86 is nondischargeable pursuant to 11 U.S.C. § 523(a)(2).

SETTLE ORDER on notice.