In re George P. KROH, Debtor.

**CAPITAL CITY BANK & TRUST, Plaintiff,**

v.

**George P. KROH, Defendant.**

**Bankruptcy No. 87–00388–1–11.
Adv. No. 87–0230–1–11.**

United States Bankruptcy Court, W.D. Missouri.

July 8, 1988.

Frank P. Barker, III, and Robert A. Pummill, Kansas City, Mo., for plaintiff.

Ronald S. Weiss, Kansas City, Mo., for defendant.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

KAREN M. SEE, Bankruptcy Judge.

Plaintiff Capital City Bank & Trust (the "Bank") seeks nondischargeability of the debt of George P. Kroh pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(2)(B). The Bank bases its case against George on an alleged principal-agent relationship between George and his brother, John. Both brothers are debtors in Chapter 11 cases in which trustees have been appointed. The Court previously determined John A. Kroh Jr.'s debt to the Bank was nondischargeable. George's debt was incurred at the same time and under the same circumstances as John's.

At trial, plaintiff appeared by attornies Frank Barker, III and Robert Pummill, and representative Del Weidner. Defendant appeared in person and by attorneys Ronald S. Weiss and Gerald H. Handley. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(B) and (I). Venue is proper pursuant to 28 U.S.C. § 1409. After considering the evidence, the Court makes the following findings of fact and conclusions of law based on proposed findings and conclusions submitted by plaintiff. To the extent findings of fact constitute conclusions of

law or vice versa, they shall be so construed.

■ Additionally, pursuant to Rule 201(f) F.R.Evid., the Court takes judicial notice of the Findings of Fact and Conclusions of Law entered by the undersigned in the following similar adversary actions against this defendant[1] to determine dischargeability of debts for loans obtained from banks by means of fraudulent financial statements: 1) *Firstate Savings and Loan v. John A. Kroh, Jr.*, Adv. No. 87–0108–1–11 and *Firstate Savings and Loan v. George P. Kroh*, Adv. No. 87–0107–1–11, which were consolidated for trial, entered June 13, 1988; 2) *Kansas National Bank and Trust v. John A. Kroh, Jr.*, Adv. No. 87–0184–1–11 and *Kansas National Bank and Trust v. George P. Kroh*, Adv. No. 87–0185–1–11, which were consolidated for trial, entered June 16, 1988; and 3) *Norbank v. George P. Kroh, Jr.*, Adv. No. 87–0632–1–11, entered June 17, 1988.

"A court may take judicial notice of related proceedings and records in cases before the same court." *MacMillan Bloedel, Ltd. v. Flintkote Co.*, 760 F.2d 580, 587[12] (5th Cir.1985). When facts are not subject to reasonable controversy, the introduction of evidence is considered unnecessary. *MacMillan*, 760 F.2d at 587–588[13], *citing* Advisory Committee Notes, F.R.E. 201(a). Additionally, evidence of the similar acts are admissible under Rule 404(b) F.R.Evid. if: 1) they are relevant to an issue other than the defendant's character; 2) there is clear and convincing evidence that defendant committed the other similar acts; and 3) any potentially unfair prejudice of the evidence does not substantially outweigh its probative value. *Cerro Gordo Charity v. Fireman's Fund American Life Insurance*, 819 F.2d 1471, 1482 (8th Cir.1987). The trial court is given wide discretion regarding the admission of such evidence. *Cerro Gordo*, 819 F.2d at 1483.

Here, George was clearly embroiled in the transactions involved in the above referenced adversary proceedings. The other,

---

**1.** The findings, conclusions and judgments were unappealed by this defendant and are now final and unappealable orders.

similar transactions are highly relevant evidence of a plan and scheme to obtain loans using false financial statements, which at the very least shows George's intent. The transactions are also relevant to show John's actual authority to act on George's behalf in the transactions and George's reckless indifference to the substance of the transactions. Finally, in addition to the notice given to the parties concerning taking judicial notice, discussed below, George was represented by counsel at each proceeding and had an opportunity to litigate the facts and issues presented in the proceedings. Accordingly, the decisions and records in those cases shall be made a part of the record in this proceeding, and the findings and conclusions from those decisions are adopted herein.

Also pursuant to Rule 201(f) F.R.Evid., the Court takes judicial notice of the court files and transcript of proceedings for entry of guilty plea in two criminal cases in which George entered a plea of guilty to two counts of. fraud under 18 U.S.C. § 1014. *See United States v. George P. Kroh*, Case No. 88-00071-01-CR-W-5 and No. 88-00072-01-CR-W-5 (W.D.Mo.). The files and transcript of proceedings held April 13, 1988 are hereby made a part of the record in this case.

Concerning notice to counsel of the taking of judicial notice, as referenced in F.R. Evid. 201(e), it is noted that counsel for George was notified on three occasions that judicial notice would be taken and any objections must be filed by certain dates. A Notice and Order was issued concerning the taking of judicial notice in all of the above adversary proceedings with the exception of *Norbank v. George P. Kroh*. A similar Notice and Order was issued concerning the taking of judicial notice in the criminal proceedings. Both set a time for counsel to file objections. No objection to the taking of judicial notice as set forth in the Notice and Orders was filed on behalf of George. Additionally, counsel for George entered an appearance during a hearing on the record conducted by telephone conference call in the *Kansas National Bank* cases concerning judicial notice of the criminal proceedings. During that hearing the Court directed that if there were objections to the taking of judicial notice in the criminal cases, counsel was to file objections by a date set in the hearing. No objections were filed on behalf of George.

## FINDINGS OF FACT

On or about August 13, 1986, Del Weidner and Matt Sabatini met with John A. Kroh, Jr. at the headquarters of Kroh Brothers Development Company ("KBDC") in Kansas City, Missouri. No one contends that George was present at the meeting, that any of the Bank representatives met George or that any of the Bank representatives ever met or spoke with George. Del Weidner is general counsel to and a trust officer of Capital City Bank, located in Topeka, Kansas. Matt Sabatini is an officer of the Bank. At all times relevant to this case, KBDC was a large, nationwide real estate development company operating along with other related entities, all of which were headquartered in Kansas City, Missouri. KBDC had a national reputation and was very well known in the Kansas City and regional area. George and John each owned 50% of KBDC. George was Chairman of the Board and John was President and Treasurer. John is also known as Jack Kroh.

The primary purpose of the August 13, 1986 meeting was to solicit and to encourage KBDC to purchase, lease or manage Mr. Frank Sabatini's properties located in the Topeka area. Frank Sabatini is the owner and chairman of the board of the Bank and owns and operates other business properties located in the Topeka, Kansas area including an office building.

During the meeting, John made a request for personal loans for himself and his brother. John told Weidner that he and his brother occasionally needed personal loans in order for them to make personal investments or to take advantage of personal investment opportunities. John stated that he and his brother had to act quickly when personal investments presented themselves and that he wanted to establish open lines

of credit for each brother at the Bank. He indicated that the funds were normally paid back within a week to a month from the time the brothers drew down on the loans. John also told Weidner that he had similar lines of credit established at other banks. John asked Weidner what Capital City Bank's lending limit was, and was told $400,000. John asked if the loan limit was $400,000 for each brother or for both brothers and was told by Weidner that the limit would apply to each loan separately.

John also represented to Weidner that KBDC was a very successful company; that it was very profitable; that all of KBDC's projects were profitable; and that none of KBDC's projects operated at a loss. John delivered to Weidner a black pouch which contained, among other things, a 1985 audited financial statement of KBDC prepared by Francis A. Wright and Company. The black pouch contained an organizational chart of KBDC, several documents marked "Confidential," showing KBDC's projects and their financial status, and several real estate appraisals concerning those projects. It also contained various promotional and advertising materials relating to the projects, including a listing of KBDC's projects and glossy pictures of several of them. John went over the contents of the black pouch, project by project, and stated that all of the projects were more than 90% occupied, that all projects were successful and carried their own weight and were making a profit for KBDC. During the meeting, John made no statements regarding KBDC's financial difficulties and its failure to generate sufficient operating funds.

Weidner requested personal financial statements of John and George. John called his secretary on the intercom and requested her to bring them in, which she did, and gave them to John. He then gave them to Weidner. Weidner gave George's financial statement to Sabatini and then looked at John's financial statement. It is significant to remember that this meeting was on August 13. Weidner remarked that the statement was dated August 15, 1986. John replied that the date was a typographical error, that the financial statements were on the computer and that they were currently updating the financial statements. John called in his secretary, asked her to change the date on the financial statement and told her to put the date of June 1, 1986 on his financial statement. The secretary changed the date and returned the financial statement to John who gave it back to Weidner. John then signed his financial statement and dated it July 13, 1986, in the presence of Weidner. George's statement was not signed and bore the date "August 15, 1986." John stated that both his and George's financial statements were current and accurate as of the date of the meeting, August 13, 1986. John also told Weidner that he had authority to borrow money on behalf of his brother. John stated that a Mr. Gilchrist, Vice President of Finance for KBDC, would be the contact for the personal loans and that if Weidner had any questions he should call Gilchrist.

The financial statement consisted of a balance sheet (page 1), a list of stocks and investment partnerships (page 2), a signature page (page 3) and a list of lines of credit (page 4). The written personal financial statement and balance sheet of George represented assets totalling $23,064,237, liabilities of $3,300,000, and a net worth of $19,764,237. Page 1 of the financial statement stated total liabilities of $3,300,000 called "bank debt." Page 4 is a specific list of lines of credit which itemized eight loans totaling 2.9 million dollars.

After the meeting, Weidner and Sabatini were taken on a tour of the KBDC offices located at 8880 Ward Parkway, Kansas City, Missouri. The tour included a tour of the corporate offices, George's office, and certain other departments within KBDC. They then toured some of KBDC's projects and properties, including a tour of the Hall Farm project. The tours of the elaborate offices and various properties all reinforced the impression made by the balance sheet and John's statements.

Upon returning to Topeka, Weidner prepared loan memoranda which included information received at the meeting, as well as information from George's personal fi-

nancial statement. He put information contained in George's personal financial statement into the loan memo in at least two different places. The purpose of the loan memo was to inform members of the Loan Committee and/or the Discount Committee, in written format, as to who was requesting the loan and the requested loan amount. It contained pertinent information regarding the financial status of the borrower and other information known to the loan officer that would be important to the decision to make the loan.

William E. Drenner is an advisor to Frank Sabatini, a director of the Bank and a member of the Discount Committee of the Bank. He reviewed the information contained in the black pouch and prepared and circulated a written summary regarding its contents to the members of the Loan Committee and the Discount Committee.

The Loan Committee consists of the Bank's loan officers and Frank Sabatini. The Discount Committee is made up of Weidner, Frank Sabatini, two independent directors for the Bank and the Bank president. Each of the members of the Discount Committee reviewed Weidner's loan memo, John's financial statement and Drenner's memo. Weidner also made an oral presentation to both Committees. The Discount Committee did not act on the loan requests at the regular meeting. Instead, the Committee met again in a special session. The loan request was ultimately approved in the amount of $400,000. Additionally, Frank Sabatini made telephone inquiries to banking contacts located in the Kansas City area that were familiar with John, George and KBDC.

On August 26, 1986, George Gilchrist, acting at Jack's request, telephoned Weidner regarding the loan and stated that Jack and George had a personal investment opportunity that they wanted to take immediate advantage of and that they wanted to act upon it quickly. Weidner told Gilchrist the Bank had approved loans to both brothers in the amount of $400,000 each and they could draw down on them as soon as the loan documentation was prepared and signed. Gilchrist instructed Weidner that the loan proceeds should be wire transferred to George's personal bank account at Commerce Bank.

Accordingly, Weidner sent by Federal Express overnight delivery the promissory notes for the loans to Gilchrist. George signed a promissory note in the amount of $400,000 in favor of the Bank on August 28, 1986. George deposited the loan proceeds in KBDC's corporate account on August 28, 1988.

George was a director of Commerce Bank, a major bank in Kansas City. He also owned substantial interests in at least three banks. He is knowledgeable about banks and banks' lending procedures. He is a sophisticated businessman, knowledgeable about the power of numbers, the use of a balance sheet, and the meaning of the entries upon the balance sheet. He was also an insider of KBDC within the meaning of 11 U.S.C. § 101(30).

John orally made the following misrepresentations to Weidner at the August 13 meeting: 1) that the loan proceeds would be used for personal investments when actually he knew that any loan proceeds would be used for KBDC; that KBDC was profitable and successful when actually as an insider he knew they were experiencing extreme cash flow difficulties; and that KBDC's projects were profitable. He also misrepresented, in writing, the personal financial conditions of himself and George by use of the financial statements given to Weidner.

The actual bank debts of George in August, 1986 are reflected on Exhibit 71. George had 29 outstanding bank loans existing as of the end of July, 1986, not eight as represented by the financial statement given the Bank. George's actual bank debt exceeded $3.3 million dollars (the amount represented to the Bank in August, 1986) in February, 1986, six months prior to the time the Bank made its loan to George. George's actual bank debt as of the end of July, 1986, was $7,309,436. Making a percentage computation as of the end of July, 1986, George disclosed to the Bank only 45.1% of the actual outstanding bank loans

as of that date. Debtors' counsel argued that the bank stock loans listed in the asset portion of the financial statement should be included in the computation of liablilities. Even if the bank stock loans of $1,525,000 were included in the debt category, the debt disclosed on the financial statement is still $4,825,000—only 66% of the actual bank debt that in fact existed as of July 31, 1986.

Additionally, the evidence showed escalating debt in the short time before the Bank's loan was made. George's outstanding bank debt grew at a rapid pace during 1986. It grew $500,000 in January, 1986; $100,000 in February, 1986; $500,000 in March, 1986; $750,000 in April, 1986; $975,000 in May, 1986; $580,000 in June, 1986; and $1,150,000 in July, 1986. In the first seven months of 1986, George personally borrowed over $5.5 million dollars. In addition to the Bank's $400,000, George borrowed $530,000 in August, 1986.

Weidner testified that the primary reason the Bank made the loan was because of the financial statement. The following facts support this testimony. First, John represented that the financial statements were current as of the August 13 meeting. Weidner had no reason to doubt that John was not an honest man during August, 1986. Second, Weidner used George's financial statement in compiling his loan memo and the Loan and Discount Committees reviewed the memo in approving the loan.

Third, the financial statement had no inconsistency on its face and it appeared to be a reliable document under the circumstances in which it was delivered. It contained nothing within its four corners that indicated that additional investigation would be required, or that any of the information therein should have been verified. The statement and its attachments appear to be complete on their face and the information contained within the statement appeared to the Bank to be sufficient information to obtain an accurate picture of George's then existing financial condition. The Bank did not know in August 1986, nor did it have any reason to believe, that George's financial statement was false. It had no information in its possession that conflicted with any of the information contained in George's financial statement. George neither alleged nor offered proof that had the Bank further investigated the information contained within the financial statement that conflicting information or other debts would have been revealed. Moreover, George, through John and Gilchrist, rushed the loan transaction, which cut short the time for the Bank to do further investigation. Finally, Weidner also testified that had he known of the 29 bank loans totalling more than $7.3 million as of the end of July, 1986, the Bank would not have made the loan to George.

On January 29, 1987, within six months after the loan was made to George, an involuntary Chapter 7 was filed against him and he was adjudicated bankrupt. Shortly thereafter on February 13, 1987 KBDC and a number of its related entities filed for Chapter 11 protection.

George invoked the Fifth Amendment privilege against self incrimination at trial.

## CONCLUSIONS OF LAW

Congress established the fraud exception to discharge to discourage fraudulent conduct and to ensure that the relief intended for the honest debtor does not inure to the benefit of the dishonest. *Jennen v. Hunter*, 771 F.2d 1126, 1130[4] (8th Cir.1985). When dishonesty is demonstrated with respect to a specific debt, the debtor is not entitled to the benefit of the debtor rehabilitation policy considerations of the bankruptcy code. *Hunter*, 771 F.2d at 1130[3]; *Thul v. Ophaug*, 827 F.2d 340, 343 (8th Cir.1987). However a creditor seeking to declare a debt nondischargeable under these sections has the burden of proving each element by clear and convincing evidence. *Matter of Van Horne*, 823 F.2d 1285, 1287[1] (8th Cir.1987). Based on the evidence adduced at trial and for the following reasons, judgment will be entered in favor of the Bank.

■ The threshold question is whether a principal-agent relationship existed between George and John. A principal-agent

relationship results from the manifestation of consent by the principal to the agent that the agent should act on his behalf. *Southern Pacific Transportation v. Continental Shippers Association,* 642 F.2d 236, 238[1] (8th Cir.1981). The Court finds actual authority in this proceeding based on the following evidence. First, the Court may draw a negative inference from George's assertion of his Fifth Amendment privilege against self incrimination. At trial, George invoked the Fifth Amendment in response to a number of questions including the following: whether George authorized his brother John to act on George's behalf in connection with the loan made by the Bank; whether George authorized his brother John to deliver George's financial statement in connection with the loan made by the Bank; whether George had signed certain promissory notes and checks; and whether George kept his financial statement on a computer authorizing both his secretary and John to deliver George's financial statement in connection with other loan transactions.

Second, George pleaded guilty to two counts of bank fraud under 18 U.S.C. § 1014. This plea constitutes an admission that he was responsible for the misrepresentations in the financial statements involved in those cases. *See* Case No. 88–00072–01–CR–W–5 and Case No. 88–00071–CR–W–5, Transcript of Proceedings, p. 17, April 13, 1988. However, in both those cases John made all the representations. *See Kansas National Bank and Trust v. George P. Kroh,* Adv. No. 87–0185–1–11, Findings and Conclusions (W.D.Mo. 6/13/88); *Norbank v. John A. Kroh, Jr.,* 87 B.R. 1004 (W.D.Mo.1988). The fact that a principal-agent relationship existed in those cases shows an absence of mistake as to the existence of a principal-agent relationship in this case.

Third, George signed the promissory note, the loan proceeds were received in his personal account, he signed a check transferring the funds to KBDC and he signed checks for the loan commitment fee (Exh. 67–E), all evidencing the fact that he was aware of the transaction and accepted the benefits of the transaction. There was no evidence indicating that George ever attempted to repudiate the transaction. Fourth, even if no actual or apparent authority existed, George ratified the transaction because he had knowledge of John's use of his false financial statement. *Dudley v. Dumont,* 526 S.W.2d 839, 847[28] (Mo.App.1975) (principal must know all material facts to ratify a transaction). The evidence in this case and in the other cases of which this Court has taken judicial notice all tend to show that George allowed his financial statement to be used by John and that he had knowledge that his financial statement was being altered by John.

Finally, when there is independent evidence that an agency relationship exists, the fact of a close familial relationship is entitled to considerable weight in tending to show an agency relationship. *Dinger v. Burnham,* 228 S.W.2d 696, 698[1] (Mo. 1950); *see also Gottlieb v. LaBrunerie,* 514 S.W.2d 27, 32[7] (Mo.App.1974). Accordingly, the Court concludes that a principal-agent relationship existed between George and John. Therefore, to the extent John's conduct was fraudulent, George should be held accountable for the conduct and the resulting debt to the Bank. *Rosebud Sioux Tribe v. A & P Steel, Inc.,* 733 F.2d 509, 571[9] (8th Cir.1984) *cert den'd, A & P Steel v. Rosebud Sioux Tribe,* 496 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506; *accord Tietjens v. General Motors Corporation,* 418 S.W.2d 75, 84 (Mo.1967).

The Bank seeks nondischargeability of George's debt in the amount of $400,000 under §§ 523(a)(2)(A) and (a)(2)(B). Because the Court concludes that the debt is nondischargeable under § 523(a)(2)(B), it is not necessary at this time to determine nondischargeability of the debt under § 523(a)(2)(A).

Under 11 U.S.C. § 523(a)(2)(B) a debt is nondischargeable if obtained by a written statement:

(i) that is materially false;

(ii) respecting the debtor's ... financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive[.]

All of the elements of this section have been met.

First, the financial statement must be in writing and either "written by the debtor, signed by the debtor, or ... adopted and used by the debtor." *In re Whitehouse*, 26 B.R. 239, 242[5] (Bankr.W.D.Ky.1982). George argues that because he did not sign the financial statement the debt should be dischargeable under § 523(a)(2)(B). However, George authorized John to use the financial statement in obtaining loans and therefore can be fairly said to have "adopted and used" the statement even though his signature did not appear on it.

Next, the financial statement must be materially false. A financial statement is materially false if it, as a whole, is found to be "a false representation of the overall financial condition of the debtor." *In re Mutschler*, 45 B.R. 482 491[6] (Bankr.N.D. 1984). A financial statement with major omissions may be considered as containing a materially false representation. *Id.* George's financial statement was materially false in both of the above respects. The statement grossly overstated his net worth and grossly understated his bank debt as of August, 1986. These misrepresentations were fraudulent and produced a financial statement that falsely represented George's overall financial condition. Moreover, a correct financial statement would have shown a pattern of rapidly escalating debt, highly relevant to a bank's determination of a borrower's credit worthiness.

Second, the Bank reasonably relied on George's financial statement. When evaluating a creditor's reliance on a financial statement, courts should be mindful of the danger of slipping into a review of the creditor's business judgment instead of focusing on whether it was reasonable for the creditor to rely on the debtor's misrepresentation. *McMillan v. Firestone*, 26

B.R. 706, 718 (Bankr.S.D.Fla.1982). Reasonable reliance comports with a bank's normal business practice. A bank should not be required to exceed its own internal policies before it will be deemed to have reasonably relied upon the financial statement of a debtor. *In re Esposito*, 44 B.R. 817, 825 (Bankr.S.D.N.Y.1984); *accord Mutschler*, 45 B.R. at 493. When a creditor's reliance is at issue under § 523(a)(2)(B) the court should examine the following:

'[T]he creditor's standard practices in evaluating loan applications; industry standards; and particular circumstances existing when the financial statement is presented ... [Reasonableness] should be viewed as a test of credibility. Reasonableness is not, with respect to the victim of an intentional tort, a framework of legal standards fashioned from an affirmative duty.'

*Matter of Earls*, 80 B.R. 978, 980 (W.D.Mo. 1987), *quoting In re Richards*, 71 B.R. 1017, 1022 (Bankr.D.Minn.1987). An independent investigation is not necessary. *Id.* Additionally, the primary purpose of the reasonable reliance requirement of § 523(a)(2)(B) was to prevent unscrupulous creditors from inducing debtors to falsify financial statements for the purpose of later using them to object to the debtor's discharge. *In re Ophaug*, 827 F.2d 340 at 343; *In re Fosco*, 14 B.R. 918 at 921–922 (Bankr.D.Conn.1981); H.R.Rep. No. 595, 95th Cong., 1st Sess. 130–131 (1977), U.S. Code Cong. & Admin.News p. 5787.

Here, the Bank relied on the statement. Weidner testified that the primary reason the Bank made the loan was on the basis of the financial statement. He also testified that the Bank would not have made the loan had the statement accurately stated the enormity of George's bank debt. The question, then, is whether the Bank's reliance on the statement was reasonable.

■ George argues that the Bank's reliance cannot be reasonable for two reasons. First, because there were discrepancies between his and John's financial statements that contradict the Bank's assertion that it carefully scrutinized the financial

statements and second, because the Bank did not follow its internal lending policies, which require a check on the borrower's previous payment record, a credit check, and a financial spread on the financial statement of the borrower. The Court disagrees and holds that the Bank's reliance was reasonable for the following reasons.

The first argument is without merit. The statements were internally consistent and the inconsistency between the statements pointed to by counsel is not readily apparent. This Court will not impose a duty to exhaustively compare financial statements when the borrowers are obtaining separate loans. Also, the figures on KBDC, the major asset, are consistent between the two statements.

As to the Bank's internal lending policies, John, through Gilchrist, rushed the loan transaction, which cut off the time which the Bank had to do further investigation. Under these circumstances, George, as John's principal, cannot take advantage of the shortened time for the Bank to investigate his financial condition because of a situation created by his agent. Second, a bank is entitled to rely on the contents of a financial statement, especially "when the provider of the financial statement is a professional person." *In re Rodriguez*, 29 B.R. 537, 540[5] (Bankr.E.D.N.Y.1983). Unquestionably both George and John are men of intelligence and "professional persons" in the field of real estate development and finance. Third, John represented that the financial statement was current, and the transaction in his office on August 13 indicated that the financial statement was in the process of being updated. Again, George is bound by this representation. The law presumes that until there is a reasonable ground to believe otherwise, a presumption prevails that men will be honest in their dealings with others. *Matter of Garman*, 643 F.2d 1252, 1260 (7th Cir. 1980), *cert den'd, Garman v. Northern Trust Co.*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981). A creditor is not required to suspect fraud in every transaction. *Rogers v. Hickerson*, 716 S.W.2d 439, 446 (Mo.Ct.App.1986); *Selle v. Wrigley*, 116 S.W.2d 217, 225[8] (Mo.Ct.App.1938).

In fact, under the circumstances to require Weidner to assume at that time that John was not an honest man would certainly place an unfair burden on the Bank.

Moreover, the financial statement was complete on its face, had no inconsistencies and contained nothing indicating that additional investigation would be required, or that any of the information should be verified. The information contained within the statement appeared to the Bank to be sufficient information to obtain an accurate picture of George's then existing financial condition. There was no evidence that the banking community was aware of KBDC's financial situation at the time the loan was made. When a financial statement, on its face, contains no information requiring further investigation and there is no evidence that a further investigation would have uncovered inaccuracies in the financial statement, the creditor's reliance upon the financial statement is reasonable. *Matter of Garman*, 643 F.2d 1252, 1259–1260 (7th Cir.1980); *In re Vairo*, 40 B.R. 776, 781 (Bankr.S.D.N.Y.1984); *In re Winfree*, 34 B.R. 879, 885 (Bankr.M.D.Tenn.1983); *Mutschler*, 45 B.R. at 493.

Finally, George had knowledge of facts and circumstances affecting this issue and failed to testify on his own behalf. This raises a strong presumption that his testimony would have been unfavorable to him. *Spaeth v. Larkin*, 325 S.W.2d 767, 771–772[6] (Mo.1959); *Block v. Rackers*, 256 S.W.2d 760, 764[6] (Mo.1953). These facts lead the Court to conclude that the Bank complied with its standard practices in evaluating loan applications to the extent time permitted. Under the circumstances existing when the financial statement was presented to Weidner, given the fact that the loan was approved by the appropriate committees and considering the absence of any facial inconsistencies in the financial statement, the Court holds that the Bank's reliance was reasonable.

The final elements are debtor's intent to deceive the Bank and proximate cause. Because subjective intent to deceive is virtually incapable of direct proof it must be inferred from all circumstances surround-

ing the transaction. *Mutschler*, 45 B.R. at 491. Additionally, when a debtor is an individual of intelligence and experience in financial matters, the mere fact that a financial statement is false and that it is known to be false is sufficient to establish an intent to deceive. *Mutschler*, 45 B.R. at 491; *Rodriguez*, 29 B.R. at 541. The evidence in other dischargeability decisions involving John, of which this Court took judicial notice, show by clear and convincing evidence that John engaged in a deliberate scheme to obtain loans from the Bank and other lenders by using a materially false financial statement. This scheme is clearly shown by the number of loans John procured for himself and George in a relatively short period of time during 1986. *See,* Exhibit 71; *Firstate Savings and Loan v. John A. Kroh, Jr.,* Adv. No. 87–0108–1–11, Findings and Conclusions (6/13/88); *Firstate Savings and Loan v. George P. Kroh,* Adv. No. 87–0107–1–11, Findings and Conclusions (6/13/88); *Kansas National Bank and Trust v. John A. Kroh, Jr.,* Adv. No. 87–0184–1–11, Findings and Conclusions (6/16/88); *Kansas National Bank and Trust v. George P. Kroh,* Adv. No. 87–0185–1–11, Findings and Conclusions (6/13/88); *Norbank v. John A. Kroh, Jr.,* Adv. No. 87–0407–1–11, Findings and Conclusions (6/13/88); *Capital City Bank v. John A. Kroh. Jr.,* Adv. No. 87–0229–1–11 Findings and Conclusions (6/23/88). All these circumstances lead to the firm conclusion that John furnished the financial statement to the Bank with the intent to deceive the Bank in order to obtain credit from the Bank. George should be held accountable for this fraudulent intent. *Rosebud Sioux Tribe v. A & P Steel, Inc.,* 733 F.2d 509, 571[9] (8th Cir.1984) *cert den'd, A & P Steel v. Rosebud Sioux Tribe,* 496 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506; *accord Tietjens v. General Motors Corporation,* 418 S.W.2d 75, 84.

Further, the Court finds that George was recklessly indifferent to the information contained in his financial statement. *See, e.g., In re Coughlin,* 27 B.R. 632, 636[4] (BAP 1st 1983). The evidence in this case indicates George knew his financial statement was on a computer to which both his secretary and John had access. The evidence in this case and George's unsworn statement in his criminal proceedings indicate he knew that John was using his financial statement to obtain loans and that he should have intervened. In the *Kansas National Bank* cases this Court found that KBDC's financial status had been deteriorating since early 1986 and that the company had severe cash flow problems. As an insider of KBDC George knew of KBDC's declining financial condition. Further, the enormous amount and numbers of personal loans John obtained for George should put a reasonable man, particularly a sophisticated business man, on notice that John was acting on his behalf and lead to some form of inquiry as to the circumstances of the transactions. George cannot escape liability simply because he chose to ignore a bad situation. For all these reasons, the Court concludes that the materially false financial statement was published with the intent to deceive.

Concerning the proximate cause element, the Bank has been damaged in the amount of $400,000 as a proximate result of John's intentionally false misrepresentations attributable to George. Absent the publication of George's materially false financial statement the Bank would not have made the loan to George. For these reasons the Court holds that George's debt to the Bank is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B). Judgment should be entered against George and in favor of the Bank for $400,000.

Accordingly, for the foregoing reasons, it is hereby ORDERED ADJUDGED AND DECREED as follows:

Judgment is entered in favor of plaintiff and against defendant George P. Kroh for $400,000. The judgment is excepted from discharge and declared nondischargeable in bankruptcy pursuant to 11 U.S.C. § 523(a)(2)(B).